ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeals of --                              )
                                           )
Supreme Foodservice GmbH                   )        ASBCA Nos. 57884, 58666, 59636
                                           )                    59811, 61361
                                           )
Under Contract No. SPM300-05-D-3130        )

APPEARANCES FOR THE APPELLANT:        Philip J. Davis, Esq.
                                      Rand L. Allen, Esq.
                                      John R. Prairie, Esq.
                                      Tara L. Ward, Esq.
                                      Nina S. Samuels, Esq.
                                      J. Ryan Frazee, Esq.
                                        Wiley Rein
                                        Washington, DC

APPEARANCES FOR THE GOVERNMENT:       Daniel K. Poling, Esq.
                                        DLA Chief Trial Attorney
                                      Steven Cruz Herrera, Esq.
                                      J. Maxwell Carrion, Esq.
                                      Kari L. Scheck, Esq.
                                        Trial Attorneys
                                        DLA Troop Support
                                        Philadelphia, PA

OPINION BY ADMINISTRATIVE JUDGE O'CONNELL

     Appellant, Supreme Foodservice GmbH (Supreme), appeals decisions by a contracting officer from the Defense Logistics Agency (DLA). In ASBCA Nos. 57884 and 61361, DLA established final rates for payments made to Supreme for delivery of foodstuffs in Afghanistan under the above-captioned contract (the contract) and demanded the return of payments amounting to $1.1 billion made under provisional rates. In ASBCA Nos. 58666 and 59636, Supreme contends that it is entitled to payment based on the original rates and seeks about $2.4 billion. Finally, in ASBCA No. 59811, DLA requests that the Board declare the contract void *ab initio* due to Supreme's guilty plea for major fraud and for a variety of other allegedly fraudulent or dishonest actions and seeks the return of all the money it paid Supreme on the contract, more than $8 billion.

     The Board conducted a hearing from January 15 to February 14, 2019, at which it received into evidence more than 3,000 Rule 4 tabs or exhibits, and heard testimony

from 14 witnesses. Both liability and quantum are before us. We sustain ASBCA Nos. 57884 and 61361 in part and remand to the parties for calculations based on this decision, deny ASBCA Nos. 58666 and 59636 with respect to Supreme's interest claim, otherwise we hold that they are moot, and deny ASBCA No. 59811.

## FINDINGS OF FACT

1. These appeals arise from a commercial item contract to furnish and deliver food in Afghanistan (R4, tabs 1, 5). DLA refers to this type of contract as "subsistence prime vendor," or SPV. SPV contracts use commercial infrastructure to support the food needs of military customers using electronic ordering. (Tr. 6/57)

*Notable Events Prior to Award*

2. On May 6, 2002, a DLA employee researching the feasibility of SPV for Afghanistan spoke with Stephen Orenstein, Supreme's Managing Director and part owner (tr. 11/154, 12/59; R4 tab 376 at 1),[1] to discuss Supreme's capabilities. The DLA employee summarized the conversation in an email and sent it to, among others, MAJ Joseph H. Alvarez, who forwarded it to Gary Shifton (R4, tab 376 at 1-2).

3. In 2002, Mr. Shifton was Integrated Supply Team Chief at Defense Supply Center Philadelphia[2]; he supervised the two contracting officers discussed in this opinion, Maryann DiMeo and Lourdes Valentin (tr. 6/54, 56). MAJ Alvarez was a 1984 graduate of the United States Military Academy at West Point (R4, tab 136). He was Chief of the Food Service Business Unit for the European Region and had been a contracting officer (CO) since about 1996 (R4, tab 376 at 1; tr. 13/10, 79).

4. After the May 2002 interview of Mr. Orenstein, DLA considered whether and how to implement SPV in Afghanistan, including a sole source award to Supreme, as documented in a series of emails MAJ Alvarez sent or received (tr. 6/64; R4, tabs 128-29, 131-32, 385, 403).

5. By the latter part of 2003, pressure grew to award an Afghanistan contract (tr. 6/89, 91). In October 2003, Department of Defense (DoD) officials visited Supreme's Kabul facility and took photos that MAJ Alvarez forwarded to Mr. Shifton. One of the attendees of the site visit was LTC Fred Lyons, who worked in MAJ Alvarez's office. (R4, tab 129 at 1-2, tab 387; tr. 6/79-83)

---

[1] Rule 4 citations are to the page number of the .pdf file.
[2] Defense Supply Center Philadelphia later became Defense Logistics Agency Troop Support (*e.g.*, R4, tab 111). We will refer to both as "DLA.".

6. The site visit drew unfavorable attention from DLA headquarters, which, among other things, had concerns about whether security protocols had been followed (tr. 6/84). In a sharply worded December 1, 2003 email on which MAJ Alvarez was copied, a DLA headquarters official ordered all visits to Supreme to cease (R4, tab 387). We find that this was an email that people likely would have remembered.

7. Just nine days later, MAJ Alvarez sent an email to Mr. Ralph Lohmann, Command Ethics Counselor, concerning his post-government employment plans, that stated in part:

> Ralph - Per our previous conversation, I wish to pursue post-government employment opportunities with Supreme Food Services in Moerfelden, Germany. At this time, my Business Unit has no dealings with Supreme Food Services or have we since I have been here.

(R4, tab 391) At the hearing, Mr. Alvarez testified both that he did not remember writing the email (tr. 13/17) and that it was accurate because "no dealings with Supreme" actually meant no "contractual dealings" with Supreme (tr. 13/109-10). We find this testimony to be self-serving and not credible.

8. On December 15, 2003, Mr. Lohmann informed MAJ Alvarez "there is no barrier to your entering into discussions with [Supreme] concerning possible employment after your retirement from the Army" (R4, tab 391).

9. Subsequent to the Lohmann emails, MAJ Alvarez continued to work with Mr. Shifton on the development of a prime vendor platform concept for Afghanistan (tr. 6/95). As late as February 24, 2004, MAJ Alvarez received an email concerning the development of that platform (R4, tab 133 at 1).

10. On March 5, 2004, Supreme hired Mr. Alvarez, who then informed DLA (R4, tab 696; app. supp. R4, tabs 851, 851A, 856).

11. Despite nearly two years of effort, at the time MAJ Alvarez gave his notice DLA had made only limited progress in developing a solicitation. On March 17, 2004, Mr. Shifton conducted a meeting of DLA officials seeking assistance in "attempting to define requirements" for a prime vendor solicitation. MAJ Alvarez does not appear to have attended. (R4, tab 416 at 11)

12. MAJ Alvarez left DLA and began transitioning from the Army to retirement on April 13, 2004, but did not formally retire until July 31, 2004 (R4, tabs 136, 407). He went on Supreme's payroll and began receiving compensation in late April 2004 (app. supp. R4 tab 1384; tr. 11/114).

13. By the end of his service, MAJ Alvarez had become disgruntled with the Army. On May 21, 2004, he wrote to a DLA official:

> Glad to be out of the "green machine" – it drained my creativity and what intelligence that I had remaining in undamaged brain cells. I am finally trying to add value and be a productive citizen.

(R4, tab 278 at 2)

14. After MAJ Alvarez had left DLA, he still had access to his DLA email and used it to forward internal DLA documents to Supreme. On April 22, 2004, MAJ Alvarez received an email from another DoD official that he forwarded to jalvarez@supreme-foodservice.com (R4, tab 698). Attached to the email were reports showing what DLA's customers in Afghanistan were ordering, including the quantities (tr. 6/110-11). DLA did not share such information with contractors (tr. 6/110).

15. On May 7, 2004, MAJ Alvarez forwarded from his DLA email to his Supreme email "Week 17 Reports" from Bahrain Maritime & Mercantile International (BMMI) DLA's prime vendor for Bahrain and Kandahar Air Base in Afghanistan (R4, tab 701; tr. 6/113). The reports included detailed information about what food items the base had ordered, the amounts billed by BMMI, and the entire catalog of items (and prices) that BMMI had in stock (tr. 6/113-17).

16. As a prime vendor, BMMI was a competitor to Supreme (tr. 6/117). DLA would not share such reports with a competitor of BMMI and if Supreme had asked DLA would have refused (tr. 6/118-19). In the subsequent price evaluation for the SPV contract, DLA ranked Supreme as first on price, ahead of BMMI which was third (R4, tab 452 at 7, 26).

17. Mr. Alvarez testified that he could not remember forwarding these documents to his Supreme email address (tr. 13/56-62). He also contended that these documents would not have been helpful in preparing Supreme's proposal (*id.*). We find this testimony to be self-serving and not credible.

18. During his testimony, Mr. Orenstein also disputed the usefulness of the documents Mr. Alvarez forwarded to his Supreme email (tr. 11/126-39). For example, Mr. Orenstein acknowledged that it contained BMMI's pricing but he contended, among other things, that because they did not break down the price into the various components, it would not have been useful (tr. 11/136-38).

4

19. Because Mr. Alvarez had left DLA by the time he forwarded these documents to his Supreme address, we find that the most likely reason was to use in connection with Supreme's proposal for the upcoming SPV contract, or perhaps other contracts.

20. DLA issued the solicitation for the SPV contract on September 3, 2004 (R4, tab 1 at 2). On November 16, 2004, Supreme submitted separate technical and price proposals (R4, tabs 644, 646). The technical proposal stated that Mr. Alvarez would be "General Manager of the Subsistence Prime Vendor Afghanistan program" (R4, tab 644 at 57). The price proposal listed Mr. Alvarez as one of Supreme's authorized negotiators (R4, tab 646 at 17). Both the technical and price proposal were signed:

> Joseph H. Alvarez
> Major, United States Army (Ret.)
> Director, U.S. DOD Division

(R4, tab 644 at 2, tab 646 at 2)

21. DLA used separate teams to evaluate the technical and price proposals but no one on either team (or anyone else at DLA) questioned Mr. Alvarez's participation (tr. 6/207-09). DLA did not take issue with Mr. Alvarez's involvement until 2015 (finding 221). DLA and Supreme by that point were involved in a titanic legal struggle involving billions of dollars and more than 40 appeals.

*The SPV Contract*

22. Upon award on June 3, 2005, the contract provided for a base period of 18 months, followed by two 12-month options, and an 18-month option. The estimated dollar value if DLA exercised all options was about $726 million with a maximum value of about $14 billion. (R4, tab 5 at 1, 3) Among other things, Supreme agreed to obtain non-perishable foods in the United States that would be shipped by the Defense Transportation System (DTS), as well as perishable foods obtained in countries closer to Afghanistan (tr. 1/14-15, 62; R4, tab 1 at 11, 14, 122).

23. The contract initially required Supreme to deliver the food by truck to four large bases: Bagram, Kabul, Salerno, and Kandahar (R4, tab 1 at 71). The "Host Nation" had the responsibility for moving the food to Forward Operating Bases (FOBs) (*id.* at 72). The contract required successful completion of 97% of the orders (a 97% "fill rate") (*id.* at 73). Until acceptance of the delivery, Supreme bore all risk of loss of the cargo and vehicles, as well as the personal injury or death of its workers (R4, tab 5 at 6; tr. 1/30-31; R4, tab 3 at 13-14).

24. DLA paid Supreme based on a "Unit Price" that was the sum of two components: a "Delivered Price" and a "Distribution Fee." The former was the invoice price for the supplier to deliver the food to Supreme's facility, plus transportation costs if DTS could not be utilized. The Distribution Fee contained all other costs, including general and administrative expenses, overhead, profit, packaging, and the cost of transport from Supreme's Afghanistan facility to the four bases. The Distribution Fee varied by product. (R4, tab 5 at 2-3; tr. 1/16-20; app. supp. R4, tab 78 at 9-10)

25. The contract contained various clauses, including FAR 52.212-4, CONTRACT TERMS AND CONDITIONS – COMMERCIAL ITEMS (OCT 2003); DFARS 252.243-7002, REQUESTS FOR EQUITABLE ADJUSTMENT (MAR 1998); and FAR 243-4, CHANGES (AUG 1987) (R4, tab 1 at 251, 262-63).

26. Because there is a dispute as to whether Supreme has proven that it made truck deliveries involving millions of dollars in fees, we highlight the following contract provisions concerning signatures. The "Inspection and Acceptance" clause provided:

> The authorized receiving official at each delivery point is responsible for inspecting and accepting products as they are delivered. The invoice/delivery ticket shall not be signed prior to the inspection of each product, unless agreed upon by the receiving activity (customer). All overages/shortages/returns are to be noted on the invoice/delivery ticket by the receiving official and truck driver. A signature on the invoice/delivery ticket denotes acceptance of the product.

(R4, tab 1 at 64) (emphasis added)

27. The "Deliveries and Performance" clause of the contract provided:

> The Prime Vendor must maintain records and provide a signed copy of the delivery invoice per U.S. Government instructions.

(R4, tab 1 at 67) (emphasis added)

*DLA Adds FOB Deliveries to the Contract*

28. The parties agreed that Supreme would delay the start of its performance as the prime vendor until December 2005 so that it would have time to ramp up while the

incumbent contractors phased down their inventories (app. supp. R4, tab 79; tr. 1/60-61). Supreme worked as a subcontractor to one of those contractors, PWC Logistics (PWC), during this interim period (tr. 1/68).

29. The contract provided that DLA could add "land-based" delivery sites and would pay only the agreed upon Distribution Fees (R4, tab 1 at 71). DLA could also require air transportation, for which DLA would reimburse the cost (*id.* at 19). If ice or heavy duty cardboard boxes (tri-walls) were required for air shipment of perishables, DLA would not pay any additional fee (*id.* at 20).

30. In 2005, delivery sites increased due to a deteriorating security situation and an increasing number of FOBs (R4, tab 1387 at 1). Shortly after contract execution, DLA decided to abandon host nation delivery to the FOBs and assign this responsibility to Supreme (R4, tab 745 at 3; tr. 1/67, 10/129-30). DLA had realized that dependence on host nation truckers to deliver food to American troops "was never a great concept . . ." (tr. 6/125-26). The problem, according to Mr. Shifton, was that these contractors were "at best inconsistent and by inconsistent, they might not decide to work . . . . They don't have the right type of assets. They don't have the proper refrigerated vehicle or even a clean vehicle" (*id.*).

31. While the contract appeared to allow DLA to assign land-based FOB deliveries to Supreme and pay only the applicable Distribution Fee (finding 29), Supreme convinced the contracting officer that the increase in work and the degree of difficulty in delivering to the FOBs made it unreasonable to expect Supreme to deliver to these sites without additional compensation (R4, tab 1387 at 2).

*DLA Modifies the Contract*

32. On August 26, 2005, the contracting officer issued a verbal change order directing Supreme to begin FOB deliveries (R4, tab 7 at 2). Initially, Supreme supported 12 FOBs but the parties knew that more would be added (tr. 1/193-95). The parties did not agree on anything other than that Supreme would begin making the deliveries. All other aspects of the deal were left to negotiation.

33. The parties began negotiating payment for delivery to the FOBs, which came to be known as Premium Outbound Transportation (POT), and which would be a separate charge from the Distribution Fees (tr. 1/203, 224). On October 14, 2005, Mr. Alvarez emailed CO DiMeo a quote that included a price of $0.49 per pound for truck delivery to Mazar-i-Sharif. Mr. Alvarez proposed start dates in November 2005 while Supreme would still be working as a subcontractor to PWC. (R4, tab 486 at 5-6; tr. 1/87-88) The contracting officer requested more detail on Supreme's costs on November 2, 2005 (R4, tab 486 at 3-4). Michael Epp, Supreme's Director,

Commercial Division, understood that the negotiation would be based on Supreme's costs and began preparing a response (tr. 5/8, 71-72).

34. As Supreme directors, both Messrs. Epp and Alvarez reported directly to Mr. Orenstein (tr. 5/11, 10/27). Although Messrs. Epp and Alvarez were the primary Supreme officials communicating with DLA, Mr. Orenstein and his partner, Michael Gans, were closely involved in the development of the rates and held final approval authority (tr. 5/74, 104, 10/128-29).

35. In a November 12, 2005, internal email, Mr. Epp wrote to Mr. Alvarez, with a copy to Mr. Orenstein, concerning the proposed rates. With respect to the truck rate of $0.49/pound net weight for Mazar-i-Sharif, Mr. Epp stated that additional sites could be added at this rate. He listed Supreme's costs, including a risk surcharge of 25%, as $0.14 "per lb net weight." (R4, tab 492 at 1)

36. Mr. Epp suggested Supreme propose a rate of $2.60 per pound net weight for transport by an AN-26 (fixed wing) airplane (tr. 5/75). He calculated Supreme's cost based on a $2,200 rate per block hour (which includes aircraft, crew, maintenance, and insurance (*id.*)), 2.5 hours average flight time (defined as the time from engine on to engine off (tr. 5/76)), and 7,500 gross load at $0.75 per pound (tr. 5/76-77). For reasons that are not clear, he calculated that this would result in a markup of 90% and allow for a $64,000 gross margin per week with one AN-26 (R4, tab 492 at 1).

37. Mr. Epp also suggested a rotary wing (helicopter) rate of $8.27 per pound. He estimated Supreme's cost at $2.60 per pound, based on a rate of $3,500 per block hour, two hours average flight time, and 3,000 pounds gross load and which, according to his calculations, would result in a markup of 76% and a gross margin of $356,000 per week. (R4, tab 492 at 1)

38. On November 23, 2005, Supreme made an offer to DLA, this time through PWC, for whom it was still working as a subcontractor (app. supp. R4, tab 12 at 2; tr. 10/154-55). Supreme proposed higher aviation prices than those suggested by Mr. Epp internally: $2.73 per pound for fixed wing deliveries with a minimum weight of 5,000 pounds, $8.68 for helicopter deliveries with a minimum weight of 2,000 pounds, as well as $0.49 for truck (app. supp. R4, tab 12 at 3-4). Supreme built the proposal based on what it knew at the time, along with projections and assumptions (tr. 10/159). At this time, Supreme had been making truck deliveries in Afghanistan on other contracts since February of 2002, although only two or three of the locations were outside of Kabul (tr. 10/156-57). Supreme had made its first air delivery in November 2005, shortly before this proposal (tr. 10/157, 160).

*Supreme's Costs vs. Its Negotiating Position*

39. On December 16, 2005, Mr. Epp wrote to Messrs. Orenstein and Alvarez, reporting actual data for December 12-15, 2005. He reported that the actual cost for the AN-26 had been slightly higher than projected at $0.78 per pound instead of $0.75, while the Mi-8 helicopter had been lower at $2.22 instead of $2.60. The average flight time for the AN-26 was 2.1 hours and 2.5 hours for the Mi-8. (R4, tab 496 at 1-2)

40. On December 25, 2005, Mr. Alvarez provided DLA a more detailed breakdown of Supreme's fixed wing and helicopter proposal (app. supp. R4, tab 16; R4, tab 201; tr. 10/162-63). He stated that the proposal was based on the assumption that the AN-26 would fly 40 hours per month and the Mi-8 60 hours per month. Using these assumptions, he stated that the proposed $2.73 per net pound for the AN-26 resulted in an "actual cost" of $2.43, and, for the Mi-8 helicopter, the proposed rate of $8.68 per net pound was based on an "actual cost" of $7.68 per pound. Mr. Alvarez also stated that the prices did not include risk of loss. Mr. Alvarez stated that the average flight time for the AN-26 was 3.5 hours and 3.2 hours for the Mi-8. (App. supp. R4, tab 16 at 1-2)

41. Mr. Epp testified that the information in Mr. Alvarez's December 25, 2005, offer was "completely false" (tr. 5/87). In fact, the costs represented by Mr. Alvarez were more than triple the actual costs he had received from Mr. Epp just nine days earlier (R4, tab 496 at 1-2). Supreme had manipulated the data by, among other things, inflating the flight times for the AN-26 from 2.1 hours in the internal email on December 16 to 3.5 hours in the email to the contracting officer (tr. 5/81-87). Mr. Epp explained that Supreme did this because "[t]here was a final price we wanted to achieve per pound. And this was just to make it fit. . ." (tr. 5/82).

42. Mr. Epp knew that "no one in [DLA] would have accepted a markup of 70-80 percent as being fair and reasonable . . . . So, we needed to submit against our knowledge false information in order to make them believe that this is reasonable." (Tr. 5/87)

43. Mr. Orenstein testified that the December 25 offer contained "projections" and "assumptions" and that DLA should have known it did not contain actual costs because it used so many round numbers (tr. 10/163-66). While the proposal included round numbers and it is true Supreme had only preliminary data at that point, we found the testimony of Mr. Epp to be more credible than Mr. Orenstein. The internal Supreme emails cannot be reconciled with the communications to the contracting officer. Even if one were to give Supreme the benefit of the doubt at this early stage, actual cost data would build in the following months but it did not result in corresponding reductions in Supreme's proposal. In any event, whether labeled as a

9

projection or not, it contained misleading and untruthful statements about profit margins, mission lengths, and other bases of costs.

44. CO DiMeo met with Messrs. Alvarez and Epp on February 15, 2006 to discuss the proposed rates and asked them for copies of all leases or contracts for "planes, pilots, housing[,] etc." to help her determine Supreme's actual costs (R4, tab 899). During the POT negotiations, she "repeatedly ask[ed] them for the same information. And although they never expressed unwillingness to provide it to me, they just didn't provide it to me. I'm constantly expressing a need for cost data, and they're saying okay. But, then, it wouldn't arrive." (Tr. 1/112)

45. Mr. Epp continued to work on building a more detailed cost submission. On February 25, 2006, Mr. Epp sent Mr. Alvarez and Mr. Orenstein an email with a spreadsheet providing "more details for each cost element" of the POT costs Mr. Alvarez had proposed in the December 25, 2005 proposal (R4, tab 901). Mr. Epp testified credibly that the spreadsheet was an effort to create a document that would provide DLA some data to support the proposed costs without disclosing enough for DLA to realize that Supreme had inflated the flight times. Thus, Mr. Epp testified:

> . . . I could use the fuel consumption . . . but I could not provide the whole set of data to DSCP because it would show that the average mission was not, let's say, three-and-a-half hours; it was only like 2.1 hours.

(Tr. 5/94-95)

46. Mr. Epp also warned in his February 25, 2006 email that Supreme's proposed trucking rate was not supportable:

> With regards of the trucking cost it appears difficult to justify the price of 0.49 USD per lb with cost. I tried my best to allocate as high as possible, but frankly, don't feel comfortable . . . .

(R4, tab 901)

47. Mr. Orenstein questioned some of the proposed costs on March 3, 2006 and returned a modified spreadsheet to Mr. Epp, apparently in the belief that it was not sufficiently favorable to Supreme (R4, tab 905; tr. 5/105-06, 121-22). Mr. Epp modified some of the numbers and sent it to CO DiMeo by email on March 15, 2006 (copying Messrs. Alvarez and Orenstein). The March 15 email and the attached spreadsheet repeatedly used the terms cost breakdown, cost overview, cost elements, and cost per hour and did not state that the numbers were mere estimates or

projections. (R4, tab 911 at 1, 4-9) The rates proposed by Supreme remained the same ($8.68 for rotary, $2.73 for fixed wing and $0.49 for truck) (*id.* at 4-8).

48. In the March 15, 2006 submission, Mr. Epp had taken numbers from the earlier spreadsheets that were "already inflated" and made them more so (tr. 5/124). For example, the spreadsheets list various costs for the AN-26 including fuel, crew, airport, and overhead costs. In the February spreadsheet Mr. Epp had listed a subtotal for these elements of $32,300 per month. (R4, tab 901 at 2) In the March spreadsheet provided to CO DiMeo, he had inflated these same costs to $54,000 (R4, tab 911 at 4). Mr. Epp arrived at this amount by, among other things, alleging that the air crew would need six furnished rooms when he knew that the pilot stayed in one room and the remaining crew in another (*id.* at 5; tr. 5/122).

49. Also striking is the risk surcharge and profit in each spreadsheet. In the internal February 25, 2006 spreadsheet, Mr. Epp suggested that Supreme represent to DLA that its "risk surcharge and profit" was 20% for the AN-26, 28% for the Mi-8, and 30% for the trucks (R4, tab 901 at 2, 4, 6). In the March spreadsheet provided to Ms. DiMeo he reduced these numbers to: 12.97% for the AN-26; 16% for the Mi-8; and 11% for truck (R4, tab 911 at 1, 4, 6, 8).

50. By the time of the March 15, 2006 submission to CO DiMeo, Supreme had performed hundreds of flights so that it had data to cross-check any estimated and projected numbers (tr. 6/33).

51. Supreme emphasizes all of the risks that it faced in accepting the POT mission at fixed rates. The Board acknowledges that Supreme faced risks, including that fuel prices would rise, currencies would fluctuate, and that the security situation in Afghanistan would deteriorate. But that does not change our fact finding with respect to the accuracy or truthfulness of the representations Supreme made to DLA.

*The Pressure to Reach an Agreement Increases on Both Parties*

52. In a May 3, 2006 email to Mr. Epp, with copies to Messrs. Alvarez and Orenstein, CO DiMeo asked to see Supreme's actual flight hours per month for each aircraft type and actual pounds delivered. She also requested that Supreme certify that its "submitted costs are accurate and submitted in good faith." (R4, tab 926 at 1-2)

53. Mr. Epp is a German citizen not trained in U.S. law, but he had "a good idea of what it means" to certify costs (tr. 5/136). He discussed it with Mr. Alvarez, the former contracting officer, who explained "that you have to write down that this is all true and in good faith and, also, that there is a legal consequence of that . . ." (*id.*).

54. Mr. Epp was reluctant to certify because he knew that Supreme had not submitted its true costs. However, he felt "enormous pressure" because Supreme had been providing POT for months without payment. He discussed it with Messrs. Orenstein and Alvarez, both of whom balked at certifying the costs because they were American citizens and "they also knew that it's not true. The person who signs it is lying." (Tr. 5/137-38)

55. Mr. Epp agreed to certify the costs, using the Contract Disputes Act (CDA), 41 U.S.C. § 7101-7109 claim certification language in 41 U.S.C. § 7103(b)(1) and FAR 33.207. He placed the language at the end of an unsigned email to the contracting officer on May 10, 2006 (with copies to Messrs. Alvarez and Orenstein) (R4, tab 926 at 1). As summarized by Mr. Epp, "we needed to appoint someone who is lying, and that was me" (tr. 5/138).

56. Neither party treated the communication as an actual claim made under the CDA. We find, based on the Mr. Epp testimony and the language of the subsequent written modification, that Supreme understood that it was submitting a request for equitable adjustment (REA). We also find that, despite the lack of an actual signature, the "certification" had the desired effect because CO DiMeo relied on it (tr. 1/115) and "believed that they were giving me real costs" (tr. 2/157).

57. To his credit, Mr. Orenstein testified that he remembered discussing the certification with Messrs. Epp and Alvarez and that Mr. Alvarez explained the certification to them (tr. 10/257-58). However, he also testified that he thought the only thing Mr. Epp was certifying was the pounds delivered (tr. 10/258). That is clearly not what the certification states and the Board finds that no reasonable business person would have drawn such a conclusion. The Board finds credible Mr. Epp's testimony that Mr. Alvarez explained claim certifications to them. Further, the Board finds the testimony of Mr. Alvarez, who stated that he did not remember speaking with Messrs. Epp and Orenstein about the certification,[3] to be incredible.

58. On May 14, 2006, Supreme reduced its proposed rates to $8.35/rotary, $2.65/fixed wing, and $0.48 truck, still on a net weight basis. These rates included purported profits of 12% on rotary, 10% on fixed wing, and 9% on trucks. (R4, tab 926 at 7-9, tab 928; app. supp R4, tab 29A at 1; app. supp. R4, tab 1058F at 9) In

---

[3] Mr. Alvarez testified as such on direct (tr. 13/67-69). DLA's counsel asked him about it in on cross-examination but it quickly bogged down when Mr. Alvarez acted baffled by the term "request for equitable adjustment" (tr. 13/153-56). Given that Mr. Alvarez spent about 15 years as a contracting officer or as a senior contracting official with Supreme (*see* tr. 13/74, 79), the Board found this to be a particularly unconvincing performance.

reality, as of June 2006, Supreme was earning 70-80% profit on aviation POT, and even more than that on trucking (tr. 5/146).

59. On July 12, 2006, Mr. Epp represented to CO DiMeo that Supreme's POT costs including tri-walls had exceeded $33.5 million. He pressed her for a resolution, citing the deteriorating state of Supreme's financial condition. He once again submitted an unsigned certification with the updated proposal. (R4, tab 1417 at 1; tr. 5/147-48) CO DiMeo felt that he was trying to "blackmail" her (tr. 1/123).

60. On July 26, 2006, Mr. Orenstein ratcheted up the pressure on DLA, stating in an email to CO DiMeo and Mr. Shifton that Supreme would begin reducing payments to suppliers (R4, tab 1418). In an August 1, 2006 email to Mr. Shifton, he offered to send a team of people to DLA "with all documents so that they can be audited at your earliest convenience" (app. supp. R4, tab 34 at 1).

61. By this point, the number of FOB sites to which Supreme delivered had grown to 68 (R4, tab 7 at 2). Supreme's threat to withhold payments to its subcontractors had the desired effect. DLA officials envisioned a scenario where the suppliers cut off Supreme and (one might infer) that they would be personally responsible for the disappearance of quality food to American forces (*see* tr. 1/127-29). DLA blinked. As CO DiMeo testified, the message from her entire chain of command was "basically 'DiMeo, fix this, get them paid, get them the money they need.'" (Tr. 1/128)

*Modification Nos. P00010 and P00012*

62. On August 2, 2006, the parties executed bilateral Modification No. P00010, which, "subject to final verification," definitized pricing for deliveries from December 2005 to June 2006 (R4, tab 7 at 1-2). The modification stated that the rates proposed by Supreme ($0.48/ground, $2.65/fixed wing, and $8.35/ rotary) were acceptable for purposes of "this equitable adjustment until verification is completed" (*id.* at 2-3). It further provided "[t]his modification begins the process for good faith reimbursement of the proposed $33.5 million equitable adjustment which Supreme has requested" for the December 2005 to June 2006 period (*id.* at 3). Later modifications referred to the Modification No. P00010 rates as the "tentative agreed rates" (R4, tabs 9, 14).

63. While Modification No. P00010 contained more specifics than the oral modification the previous year, it failed to specify a profit rate to which Supreme would be entitled, or whether Supreme could charge a minimum weight for deliveries. At the hearing, CO DiMeo explained the gaps in the modification by stating that in her view it was "an interim agreement in response to . . . blackmail" (tr. 2/79).

13

64. The modification also did not state whether Supreme would bill DLA based on gross weights, which is important for aviation purposes, or net weights, which removes, for example, packing materials. The Board finds, however, that there is no dispute on this issue. Supreme agrees that the truck deliveries under the original contract were based on net weights and that Supreme proposed POT fees using net weights. (Tr. 18/181-84; app. br. at 62) Supreme contends that the deal was for it to bill DLA using the net weight but that it would also receive a guaranteed minimum weight (app. br. at 62).

65. At approximately this time, DLA asked the Defense Contract Audit Agency (DCAA) to conduct an audit of Supreme's proposed POT costs. DCAA advised Supreme on September 23, 2006, that "[f]or us to be able to issue an opinion on the reasonableness of your proposal, we must be able to verify actual costs" (R4, tab 967 at 10).

66. Supreme did not express any objection to DCAA verification of actual costs and on October 10, 2006, the parties entered into bilateral Modification No. P00012. The modification provided that Supreme would be reimbursed at 75% of the Modification No. P00010 rates until "the DCAA audit" had been completed, at which time additional adjustments could be made[4]. (R4, tab 9)

67. Mr. Alvarez executed Modification No. P00012 for Supreme (R4, tab 9). The Board finds that, as a former DLA contracting officer, Mr. Alvarez would have known, at least in general terms, what an audit entailed. Even Mr. Epp, who had no previous exposure to U.S. government contracts, understood that DCAA would examine Supreme's actual costs (tr. 5/154-55, 206).

68. During the first years of contract performance, Supreme never objected to undergoing a DCAA audit (tr. 1/144). In fact, during the course of the contract Supreme participated in eight DCAA audits, six of which pertained to issues other than POT (tr. 2/192-93).

69. Mr. Orenstein testified that he believed DCAA would only verify and validate Supreme's cost model, which was built on some actual costs, along with predictions, assumptions, and estimates. When asked by his attorney if he understood that DCAA would be auditing Supreme's actual incurred costs and that Supreme would only be able to recover its "allowable costs," Mr. Orenstein replied "absolutely

---

[4] In November 2007, bilateral Modification No. P00043 added a second rotary rate of $8.05 if the government provided fuel. In August 2010, bilateral Modification No. P00076 changed the reimbursement rates to $4.05/3.75 per pound for rotary wing; $1.41/pound for fixed wing and $0.30/pound for truck deliveries. (R4, tabs 14, 19)

14

not." (Tr. 10/209-10) The Board finds this testimony dubious, at best. As the head of a company performing a multi-billion contract, Mr. Orenstein knew, or should have taken the time to learn, what DCAA does when it conducts an audit, particularly before he offered to bring all the documents to DLA to be audited (finding 60).

70. The Board further finds that, even if DCAA had conducted an unconventional audit, it would not have been helpful to Supreme. If DCAA had reviewed Supreme's internal estimates and assumptions discussed above, it would have discovered the disparity between the internal numbers and those Supreme provided to DLA.

71. On October 20, 2006, CO DiMeo reported to Supreme that DCAA had returned Supreme's proposal as inadequate for audit (R4, tab 976 at 10). This prompted an email from Mr. Epp to Mr. Alvarez in which he expressed doubt about what Supreme could prove. He stated: "[i]t turns out that we should retroactively justify the rates by showing them our real cost in all details which we can't or if we try to do won't match with the rates." (R4, tab 976 at 1)

72. In an email to Mr. Alvarez on January 25, 2007, Mr. Epp stated that he had analyzed the road transportation costs to FOBs for the December 2005 to October 2006 time period, and had determined that revenue was far beyond costs. Among other things, he calculated that the average cost per trip was $1,051 but average revenue was $7,087. He also observed that the number of trips for which Supreme had charged DLA was higher than the number of trips for which Supreme had invoices. (R4, tab 547 at 2)

73. After a DCAA auditor requested a meeting with Supreme, Mr. Epp emailed updated figures to Mr. Alvarez on February 1, 2007, that highlighted the difference between Supreme's "real cost so far" and what it had charged DLA (tr. 5/162). He stated that road revenue through October 2006 had been $25.7 million but that Supreme's direct costs had been only $3.8 million. He also stated that there were 1,523 road trips for which Supreme had invoiced DLA for which he could not find documentation, which meant that $7.3 million might need to be reimbursed to DLA on just this discrete issue. (R4, tab 552 at 1-2) Indeed, Mr. Epp understood that Supreme had charged DLA $7.3 million for deliveries to FOBs that it had not made (tr. 5/164).

74. For air transport, Mr. Epp stated that revenue was $24.5 million and direct costs were $8.5 million. Referring to the difference between costs and revenue as the "gap," Mr. Epp stated that he expected the total gap for 2006 to be about $40 million. (R4, tab 552 at 2)

15

*Mr. Epp and CO DiMeo Depart/CO Valentin Arrives*

75.  Mr. Orenstein terminated Mr. Epp's employment with Supreme on March 7, 2007.  The reason for the termination is disputed, but Mr. Epp testified that he believed it was because he sent emails to various Supreme employees raising concerns about the amounts Supreme was charging DLA for POT, which caused Mr. Orenstein to become "very angry" with him.  (Tr. 5/165-67)

76.  But Mr. Epp did not go away quietly.  He had been keeping a secret archive of more than 50,000 documents on a home computer that he backed up "every second day" (tr. 6/49-50).  He eventually turned these documents over to the Defense Criminal Investigation Service and the Department of Justice (DOJ) and came to the United States voluntarily for 12 days of interviews by government investigators (tr. 6/44-45; app. supp. R4 tabs 1130, 1130E at 2, 1191, 1191A, 1423).[5]  We will describe the ensuing criminal and False Claims Act litigation below.

77.  CO DiMeo ceased working on the contract in November 2007 (tr. 1/166).  Lourdes Valentin became the contract specialist in December 2007.  She received her warrant and became CO in March 2008.  (Tr. 2/182-83)

78.  While, as noted, Modification No. P00010 did not specify whether DLA would pay Supreme for minimum billable weights, CO DiMeo had agreed to pay minimum weights, including 2,000 pounds for helicopters (R4, tab 112 at 22-23).  Supreme calculated a net weight of the delivery and then if the net weight was below the minimum, it charged DLA the higher number (ex. A-18).

79.  The actual weight of some deliveries was below the minimum during this time but DLA did not know whether it was due to the small size of the orders or whether the helicopter/airplane/truck was reaching its volumetric capacity before it reached the minimum weight (R4, tab 1387 at 4, 16).

80.  During the first years of the contract, Supreme's inefficiency appears to have resulted in the inefficient use of its aircraft and thus increased the aviation costs.  Mr. Charles Szar, who became Supreme's Aviation Operations Controller in May 2008 (tr. 14/9), testified that when he started, Supreme employees were treating the SPV contract as if Supreme were being paid per hour rather than per pound.  He testified that "the guys when I first got there were high fiving each other for exceeding, you know, 100 flights [per day.]  [T]hat wasn't doing us any good because we weren't

---

[5] DLA has objected to app. supp. R4, tab 1423 as protected by the attorney-client and work product privileges.  We need not resolve the objection because we cite it for the limited purpose of establishing that the Epp debriefings had occurred by June 2010.

16

getting paid on a per-hour basis . . . ." (Tr. 14/30-31)  He testified that he eventually instituted reforms that emphasized moving as much weight as possible per flight (tr. 14/31-37).

81.  In August 2008, CO Valentin decided that DLA would pay only for actual weights (R4, tab 1387 at 4, 16).  This would be the first of several steps she took to extricate DLA from what she clearly came to view as a bad deal.

*The Audits*

82.  DCAA issued a report on December 19, 2008, stating that the documentation submitted by Supreme was not adequate to support its proposal (R4, tab 30 at 1-2).  Among other things, DCAA recommended that Supreme refund most of the Distribution Fees it had been paid for the FOBs (*id.* at 2, 11-13).  CO Valentin was not satisfied with the thoroughness of the report (tr. 2/208).  The auditors who performed this audit did not testify at the hearing and most of the testimony concerned the second audit discussed below.

83.  At a meeting with DLA in October 2009, Supreme for the first time took the position that POT rates should not be established by an audit of its costs but rather a price analysis using benchmark data from other contracts as well as consideration of the risk of performing POT (app. supp. R4, tab 63 at 1-2; tr. 2/233-35).

84.  After Supreme submitted a revised proposal on October 15, 2010 (R4, tabs 52-55), DCAA performed a second audit.  DCAA followed FAR Part 31, CONTRACT COST PRINCIPLES AND PROCEDURES, per its usual practice when auditing both fixed price and cost reimbursement contracts (tr. 7/109, 17/75).  By the time of the second audit, Supreme was delivering to 239 FOB sites (R4, tab 102 at 13).

85.  DCAA issued its second audit report on August 29, 2011, covering the period from November 2005 through August 2010, which consisted of more than $702 million in claimed costs (tr. 7/120-21; R4, tab 102 at 4).  The second audit was much more thorough than the first, examining almost 10 times the number of transactions (tr. 17/77).

86.  A brief history of Supreme at this juncture will provide some context.  Supreme was established by Mr. Orenstein's father, who served in the U.S. Navy during World War II.  He eventually settled in Germany before he opened Supreme.  Mr. Stephen Orenstein began working at the company in 1985 at which point the business seems to have been of a fairly modest scale.[6]  (Tr. 10/14-15)  As recently as

---

[6] In case any part of this opinion causes the reader to wonder about Mr. Orenstein's
    command of English, we observe that he attended high school and college in

1996, the company employed only six workers (tr. 10/17). The business then began to grow but in 2004 it still had only 300 employees (tr. 10/17-20, 25). After Supreme was awarded the SPV contract in 2005, it grew to 10,000 direct employees plus another 20,000 closely managed security personnel and truck drivers (tr. 10/25). The results of the second DCAA audit suggest that Supreme's capacity to maintain orderly records did not keep pace with the rapid growth of the business.

87. Mr. Mark Davis was the DCAA co-lead auditor (tr. 7/87-88). He has been an auditor at DCAA since 2005 and is currently a resident auditor at a major defense contractor (tr. 7/90-93). When asked during direct examination if Supreme's records were "in accordance with any sort of general business standard of accounting?" he replied "absolutely not" (tr. 7/113). He went on to describe problems that were "unprecedented" in his experience for a company of this size (tr. 7/114-17, 127-28, 145-47, 151, 154, 173-76).

88. The problems with Supreme's records cannot be attributed to a lack of resources. In 2007, Supreme acquired Microsoft Dynamics, a sophisticated accounting program that gave Supreme the capability of recording expenses directly into its general ledger, which is what most companies do (tr. 7/114-15). Supreme, instead, would post a single lump sum amount in the accounting ledger and record the individual expenses in Microsoft Excel workbooks. The employees who recorded the data did so inconsistently and without controls to ensure accuracy, resulting in significant differences between the workbooks and the accounting system. (Tr. 7/114-119)

89. To Mr. Davis, this demonstrated that, "they were not performing any kind of control to ensure that the . . . accounting ledger was actually based off of these recorded expenses in their Excel documents" (tr. 7/115-16, 118-19). He concluded that, when combined with other problems DCAA discovered, it demonstrated "at every level that Supreme lacked proper accounting controls to ensure amounts were accurately recorded, accurately tracked, and that they were properly supported" (tr. 7/118).

90. The major parts of Supreme's proposal DCAA audited were:

| | |
|---|---|
| Rotary wing lease costs | $266,386,561 |
| Truck costs | $166,840,769 |
| Fixed wing lease costs | $74,648,395 |
| Rotary fuel | $37,871,149 |
| Fixed wing fuel | $30,044,715 |
| Allocated overhead | $23,384,051 |

---

the United States (tr. 10/14). During his three days of testimony, he spoke nearly flawless English with a slight German accent.

18

DCAA did not audit other overhead and parking fees totaling $100,163,286. (R4, tab 102 at 23, 27; tr. 7/121-22)

A. *DCAA's Rotary and Fixed Wing Findings*

91. While DCAA spent over 3,400 hours on the audit, it could not audit every delivery (tr. 7/122). There were more than 37,000 rotary wing trips alone during the audit period (tr. 7/140; R4, tab 102 at 33). Thus, DCAA selected samples of each mode, including 145 rotary wing and 145 fixed wing flights, the results of which it then projected to the full number of deliveries (R4, tab 102 at 33, 49; tr. 7/141-43).

1. *Rotary and Fixed Wing Lease Costs*

92. Supreme calculated its costs based on lease and fuel costs. It calculated the lease cost by multiplying the block hours (engine on to engine off) by the lease rate with its vendor. It calculated the fuel cost by multiplying the fuel burned by the rate charged by Supreme Fuels, a related division. (R4, tab 102 at 35-36, 51-52)

93. Supreme did not keep any copies of the flight plans it filed with Afghan authorities (tr. 7/235; 9/79). As explained by DCAA, Supreme calculated its costs using its own internal flight records from November 2005 to August 2010 (tr. 7/174-76; R4, tab 102 at 38, 42-43, 51).

94. DCAA was able to confirm that Supreme had paid the invoices for the 290 rotary and fixed wing flights it examined (R4, tab 102 at 37, 53). However, as Mr. Davis explained at the hearing, payment was not by itself conclusive proof that the costs were appropriate because it did not prove that the payment was in the correct amount and was made for a flight on the SPV contract. Nor did it guard against employee misconduct, for example, an employee who makes a deal with the subcontractor to include unauthorized charges in the invoice. He explained, "[y]ou need the contract to see what you should have paid them. You need the invoice to see what services were performed. You need the flight record to see if the flight was actually made." (Tr. 7/203; tr. 8/10, 73)

95. DCAA first sought to compare the lease rates in the subcontracts with the invoices and Supreme's proposal to DLA. But Supreme could not produce the subcontract for nearly half (68) of the rotary flights. In addition, for 24 flights in the sample, DCAA found discrepancies between the subcontract rate, the invoice, and/or the amount sought from DLA. (R4, tab 102 at 40-41)

96. Second, DCAA compared the lease hours in Supreme's proposal with the hours recorded by the pilots in the flight records. DCAA learned that in 2010 Supreme had terminated its rotary wing subcontractor for overstating flight hours. DCAA asked

Supreme for documents quantifying the overstatement, but Supreme alleged that it had none. DCAA also asked Supreme for documentation as to how it monitored and supervised pilots so that they did not overstate hours, but Supreme stated that it had none. (Tr. 7/179-81; R4, tab 102 at 42)

97. Another issue identified by DCAA concerned the pilots' use of standards for the flight time and fuel burn recorded, which were preprinted on some of the flight records (tr. 7/157-59; R4, tab 643 at working paper I-06b). DCAA noticed that the recorded flight times and fuel burns were the same or very similar to the standards in one-third or more of the flights (R4, tab 102 at 42, 47). For example, on flights from Bastion to Delaram on August 13 and 17, 2010, the Supreme helicopter carried a load of 2,932 pounds on one day and 4,279 on the other, but the flight record represented that each flight had burned exactly 750 liters of fuel and had taken exactly 1.43 hours (tr. 7/165; R4, tab 642 at working paper 09a-2).[7] As Mr. Davis testified, this leads to the following questions: "did they really make the trip, did they truly monitor it[?]" (tr. 7/166).

98. DCAA asked Supreme for information as to how it developed, implemented and monitored use of the standards to ensure that the flight times and fuel quantities were reasonable, but Supreme said it had none (R4, tab 102 at 42). Supreme also told DCAA that it had subsequently eliminated the preprinted standards "because it could encourage a lazy pilot to incorrectly record their hours" (*id.*).

99. Due to concerns over the accuracy of Supreme's records, DCAA requested a technical analysis of flight times and fuel burns (R4, tab 102 at 42). Three subject matter experts, two of whom were pilots or former pilots in the Air Force, and a DLA contract price/cost analyst issued a report opining that Supreme had overstated rotary flight times by 12.64% and fixed wing by 38.96% (R4, tab 101 at 2). They also concluded that Supreme's claimed fuel quantities were reasonable if matched to the correct flight time (*id.*).

100. Only one of the three report authors testified at the hearing. Mr. Donald Anderson (who had performed the fixed wing analysis for the technical report) testified for DLA as "an expert in military and commercial transportation logistics in the CENTCOM area of responsibility." (Tr. 9/28-29)

101. Complicating matters somewhat, on cross-examination Mr. Anderson admitted that at his deposition in 2014 he had "disavowed" his 2011 technical analysis, albeit not his overall conclusions (tr. 9/139). He explained that he had disavowed the

---

[7] The path in tab 642 to the cited documents is: tab 642 → working paper 09a-2 → click on email entitled "RE: Accepted Block Hours and Accepted Fuel Usage" → open the first two .pdf attachments.

analysis because it was based upon Supreme's flight records which he had since found to be unreliable and he stuck by his overall conclusion that the flight times were overstated (tr. 9/139, 217-18).

102. Based on the 2011 technical analysis, DCAA decreased flight times that the technical analysis had found to be overstated. For flights in the sample that the technical analysts did not review, DCAA decremented the flights by 18 minutes for rotary flights and almost 84 minutes for fixed wing, which were the average number of minutes for each mode questioned in that analysis. (R4, tab 102 at 42-43, 57-58)

103. As a result of the various issues that it had identified, DCAA questioned $203,280,182 in fixed wing and rotary lease costs (R4, tab 102 at 27).

2. *Rotary and Fixed Wing Fuel Costs*

104. DCAA attempted to verify the cost of fuel Supreme had obtained from its related division, Supreme Fuels. However, Supreme failed to provide DCAA sufficient access to its records for DCAA to confirm the price per liter. As described by Mr. Davis, over a four-month period Supreme alternately refused to provide information and then changed course and agreed to provide it, only to renege. (R4, tab 102 at 45-46; tr. 7/145-51) At a couple of points, Supreme furnished DCAA some information. In the first instance, the Excel workbooks provided did not reconcile to Supreme's accounting records in Microsoft Dynamics, an unusual result for a company using advanced accounting software (tr. 7/147-48; R4, tab 102 at 45).

105. In the second instance, the data did not reconcile to the portions of Supreme's financial statements it made available without manual adjustments in the millions of dollars. DCAA asked Supreme for its complete financial statements (balance sheet and notes to the statement) but it refused (R4, tab 102 at 45-46; tr. 7/149). Mr. Davis found this denial of access to be unusual, but as he observed, such access would have revealed fuel quantity data and "[w]e would have been able to likely determine how many flights they had actually made or how much fuel was actually burned and used. There was something that they simply didn't want us to see there." (Tr. 7/150)

106. DCAA issued two formal "denial of access to records" letters, the only times Mr. Davis had issued such letters in his 14 years with DCAA (tr. 7/90, 151; R4, tab 102 at 46). DCAA questioned the fuel sales data for the 2005 – 2009 time period in its entirety, or $67,915,864 (R4, tab 102 at 27). Because Supreme combined fuel and lease costs in 2010, DCAA could not identify fuel costs for that year and, therefore, could not identify questioned costs for that year (*id.* at 32, 35, 48, 51, 60).

107. In its brief, Supreme contends that FAR 31.205-26(e), Material Costs, permits the transfer of fuel between divisions of a corporation at price, and that it had done so (app. br. at 49-50). Mark Davis agreed in his testimony that this is permissible if it is the accepted practice in the organization to do so, but when DCAA asked for evidence of the practice, Supreme failed to provide sufficient documentation. Moreover, he testified credibly that even if Supreme had provided the information, DCAA still would have tested the data by, among other things, examining vendor invoices, which Supreme had not provided. (Tr. 8/45-47; tr. 17/87; R4, tab 102 at 45-46)

108. On a separate but related issue, Supreme had included vehicle and generator fuel totaling $17,951,585 in the allocated overhead costs audited by DCAA (R4, tab 102 at 74; *see* finding 90). DCAA questioned this amount in its entirety based on Supreme's denial of access to the fuel records (R4, tab 102 at 79).

B. *DCAA's Truck Findings*

109. As with the rotary and fixed wing aircraft, DCAA initially selected for audit 145 out of the more than 50,000 truck trips. Because the sample found a number of high dollar value items, DCAA performed the audit on 145 randomly selected trips, plus 145 high dollar value trips. (Tr. 8/100-01, 103; R4, tab 102 at 64) Mr. Russell Chiles was the auditor primarily responsible for the truck costs (tr. 8/83-84).

110. DCAA found problems that were similar to those found during the rotary and fixed wing audit. Supreme subcontracted the truck deliveries in their entirety, or nearly so (tr. 8/92). Yet, it could not produce any subcontracts or invoices from the subcontractors for 2005, 2006, or 2007 (tr. 8/92-93, 97; app. supp. R4, tab 511).

111. As described above, the SPV contract required Supreme to obtain a signed invoice or delivery ticket when it made a delivery and produce it on DLA's request (findings 26-27; *see*, *e.g.*, app. supp. R4, tab 439). Supreme submitted as proof of delivery to DCAA what it referred to as a signed "manifest." But it was unable to produce a signed manifest for 78 of the 290 transactions audited. (R4, tab 102 at 70, 73; tr. 8/95; tr. 15/110) DCAA found other instances where Supreme charged DLA for a 40-foot truck but had actually used a cheaper 20-footer (R4, tab 102 at 68).

112. Based on the results of its audit of the samples, DCAA questioned $77,537,970 of the truck costs for the 2005 – 2010 period (R4, tab 102 at 23). The vast majority of these costs related to two items. First, the lack of a truck manifest represented more than 40% of the questioned road costs in both the randomly selected and high dollar samples (*id.* at 67, 71).

113. Second, DCAA applied a decrement of 20.17% based upon an alleged failure by Supreme to conduct a price analysis of subcontractors (R4, tab 102 at 68,

73). The subcontractor selected by Supreme had been the third low bidder. Supreme represented to DCAA that it had not selected the low bidder because it did not have enough trucks for work it was already performing for Supreme and because it had not performed well. Supreme also represented that it did not select the second low bidder because that company was working on a Supreme contract with the United Kingdom and Supreme did not want to risk giving it too much work. (R4, tab 102 at 68)

114. DCAA did not accept Supreme's explanation and calculated the 20.17% decrement based on the difference between the selected subcontractor and the lowest priced subcontractor (R4, tab 102 at 68).

C. *Second Audit Summary*

115. DCAA examined $602,583,118 in claimed costs. It questioned $375,697,758. (R4, tab 102 at 19)

*Maximum Rates Based on the Costs Supreme Submitted to DCAA*

116. DCAA's report identifies the actual pounds claimed by Supreme at that time (R4, tab 102 at 19). The pounds and costs submitted by Supreme to DCAA can be used to calculate maximum potential rates if the pounds are accepted and none of the costs questioned by DCAA are removed from the calculation. The numbers are striking because, even if none of the costs submitted to DCAA were questioned, Supreme still falls far short of supporting the Modification No P00010 rates:

|  | PROPOSED COSTS | POUNDS | MAX. RATE (Costs ÷ Weight) (w/o profit) | ORIGINAL RATES (Modification No. P00010) |
|---|---|---|---|---|
| Rotary | $325,185,434 | 88,748,398 | **$3.66** ($3.36 w/ fuel) | $8.35 |
| Fixed Wing | $125,846,398 | 95,219,631 | **$1.32** | $2.65 |
| Truck | $251,714,574 | 788,351,559 | **$0.32** | $0.48 |

(R4, tab 102 at 19; finding 62) Thus, Supreme would receive a profit of more than 100% for rotary and fixed wing if it were paid using the Modification No. P00010 rates (as well as a road profit of 50%).

117. If the contracting officer had removed all of the costs questioned by DCAA, the final rotary and fixed wing rates would, of course, have been much less than the above theoretical maximums. But she made significant adjustments to DCAA's findings.

*The Contracting Officer Unilaterally Sets Final POT Rates*

118. As of September 30, 2011, DLA had paid Supreme $1,383,807,545 in POT charges and more than $5.5 billion for the entire contract. On December 9, 2011, CO Valentin issued a contracting officer's final decision (COFD I) finalizing POT rates in accordance with the analysis set forth in a price negotiation memorandum (PNM). (R4, tabs 111, 1233)

119. After receiving the 2011 audit report, CO Valentin worked with her colleagues at DLA for over three months to finalize the rates (tr. 3/44-45; R4, tab 1233). Their analysis is documented, in part, in the PNM and also in other documents collected in Rule 4, tab 1233, including a 69-page Revised Addendum to the Pre-Negotiation Briefing Memorandum (RAPNBM). CO Valentin accepted DCAA's conclusions with respect to flight hours and worked out a method to compensate Supreme for some of the claimed fuel costs. She departed from DCAA substantially on the number of proven flights. (R4, tab 1233 at RAPNBM)

*Aviation Hours*

120. CO Valentin incorporated the reductions in flight times from the technical analysis and audit without change (tr. 3/35; 4/57-58). The Board finds that the record strongly supports her decision.

121. DLA's expert, Donald Anderson, testified credibly concerning the poor quality of Supreme's flight records, calling it "the worst data I've ever worked with in the logistics community" (tr. 9/32). Supreme's records were replete with instances where it failed to enter flight dates, or created confusion by switching back and forth from mm/dd/yyyy to dd/mm/yyyy formats; contained unpredictable changes in the method of recording flight times so that, for example, a 90-minute flight could be recorded as 1:30 or 1.50 and that sometimes one method was used but the context indicated that the other had been intended; lacked work order numbers (making it difficult to confirm whether the routes were accurate); had large discrepancies between various measures of time, for example, between tach time (engine on to engine off) and total time; and failed to indicate whether flights were one way or round trip (tr. 9/34-45; R4, tab 626 at 65-67; tab 1298 at 45-47). He explained that "it's nearly impossible to do any large-scale analysis on a data set that's not even close to homogeneous" (tr. 9/45).

122. As part of his 2018 supplemental report, Mr. Anderson prepared an analysis of Supreme flights for the AN-26 airplane from Kabul to Farah in 2009. Mr. Anderson used SkyVector, a software application used worldwide to create flight plans. He first generated a flight plan for a C-130H on that route and received a

24

projected flight time of 1.45 hours. He then cross-checked it with actual C-130H flights on this route from 2005 - 2007 and found that the SkyVector prediction was within .01 hours of the actual flight time. He thus concluded that SkyVector would produce accurate flight times on this route, and could reasonably be used for an AN-26. (R4, tab 1298 at 13-14; tr. 9/73-78)

123. When Mr. Anderson input the AN-26 in SkyVector it calculated an expected round-trip flight time of four hours, six minutes. This contrasted sharply with Supreme's records for 71 AN-26 flights on the Kabul-Farah route in 2009. He found that Supreme's average recorded round trip flight time was five hours, forty minutes. (R4, tab 1298 at 12-15; tr. 9/73-78) Thus, Mr. Anderson concluded that Supreme (or its subcontractor) had inflated the flight times on this route by 38.2%. This is only slightly lower than the 38.96% Mr. Anderson calculated in the 2011 technical analysis used by DCAA (finding 99).

124. Because Mr. Anderson's analysis of AN-26 flights on the Kabul-Farah route in 2009 was limited in scope, the Board must consider it in light of the record as a whole. In addition to Mr. Anderson's analysis of 2009 AN-26 flights, the Board found the following evidence to be of great weight with respect to flight times: 1) Michael Epp's credible testimony that Supreme exaggerated flight times to inflate its costs (finding 45); 2) DCAA's discovery that Supreme terminated its rotary wing subcontractor in 2010 for overstating flight hours but failed to keep any documentation on the overstatement (finding 96); 3) DCAA's finding that Supreme used prerecorded flight times and fuel burns that resulted in improbable similarities among various flights (finding 97); 4) DCAA's finding that Supreme failed to keep records and properly record costs[8] (which was similar to Mr. Anderson's findings) (findings 88, 95-96, 98, 111); 5) the Board's findings concerning the lack of credibility of Mr. Alvarez and Mr. Orenstein (findings 7, 17, 43, 57); 6) Supreme's refusal to turn over records to DCAA (finding 106) and its refusal to undergo an audit for POT for the period after August 2011 (discussed below); and 7) Supreme's demonstrated track record of dishonesty on this contract (discussed below).

125. The Board finds that Supreme did not submit adequate proof of its actual flight times to persuade us that the flight hours were accurate. Further, the Board finds that Mr. Anderson's calculations of a 38% fixed wing flight time inflation are the best evidence of Supreme's actual fixed wing flight times. We also find that the calculation in the 2011 technical report by an Air Force pilot with over 2,000 rotary wing flight hours (R4, tab 101 at 2) of a 12.64% overstatement for rotary wing flight times is the best evidence in the record for these flight hours.

---

[8] The testimony of Mr. Szar, Supreme's Aviation Operations Controller, concerning Supreme's recordkeeping at least through 2008 was generally consistent with that of DCAA (tr. 14/9-10, 72-73, 84-86, 90-95, 101, 103).

126. Accordingly, we find that the contracting officer acted reasonably by incorporating the reduced flight times from the DCAA audit report.

*Aviation Flights*

127. Although the second DCAA audit was very thorough, by questioning more than half of both the rotary and fixed wing lease costs, it presented the contracting officer a dilemma. Supreme had performed well, filling almost all of the orders placed (although filling orders does not by itself prove how many flights it made) (finding 148). If Supreme failed or refused to continue with POT due to inadequate payments, there was no other contractor prepared to take over immediately, which would have meant "mission failure" and placing American forces on operational rations (tr. 3/128-30; R4, tab 602 at 3-5). The contracting officer, therefore, had compelling reasons to make sure that Supreme was adequately compensated.

128. On many of the rotary trips, DLA concluded that the trip had taken place, but the lack of a subcontract had caused DCAA to question the costs. For such trips, CO Valentin calculated rates by locating other SPV contract flights by the same helicopter make and model for which Supreme had a subcontract. She then used those subcontracts to calculate the average rates Supreme paid for that model. She determined that the average rates for flights with a subcontract were slightly lower than for those without (about 1% for some models, 5% for others); she then applied the average rates to the rotary flights with missing agreements. (R4, tab 1233 at PNM at 11-12, "RE Revised Rotary Wing Lease and Fuel Costs for negotiating objective (2).msg," at attachment "I-06 Testing of Rotary Sample - Revised for DLA Negotiations (No 3).xlsx" at Column F)

129. The end result was that CO Valentin credited Supreme with about 55% of the rotary lease costs questioned by DCAA, or about $87 million (R4, tab 1233 at PNM at 13). The Board finds that CO Valentin's pragmatic approach was reasonable based on the information that she had and that Supreme has not proven that the Board should make an additional upward adjustment.

130. CO Valentin and her team performed a similar analysis of fixed wing flights, which led her to restore $5,949,911 of the fixed wing costs. She calculated costs using the same method she used on rotary flights, by averaging rates for similar aircraft for which Supreme produced the subcontract and applying them to the flights without agreements. (R4, tab 1233, at PNM at 13-14, "RE Revised Rotary Wing Lease and Fuel Costs for negotiating objective.msg," at "I-05 Testing of Fixed Wing Aviation Sample - Adjusted 12-09-11.xlsx" at the "Fixed Wing Aviation Testing" tab, at Column CY). We find that this was reasonable under the circumstances.

*Aviation Lease Decrement*

131. CO Valentin decremented both the rotary and fixed wing rates "to protect the government from significantly overpaying" because Supreme had not performed a price analysis of the aviation subcontractors. She calculated a 3.36% decrement based on an average of the four low rotary wing bidders Supreme received in December 2010 (after the time period covered by the audit). This decreased Supreme's rotary lease costs by $6,852,984. (R4, tab 1233 at PNM at 12-13) CO Valentin also used the exact same 3.36% decrement for fixed wing costs, which resulted in a further $1,167,205 deducted from Supreme's costs (*id.* at 14).

132. In her testimony, CO Valentin did not attempt to justify the decrement with a merits-based analysis. Rather, she testified that she took the rotary decrement essentially as a bargaining chip to use with DCAA to obtain its agreement to the upward adjustments she made elsewhere (tr. 4/67-68). (Presumably, CO Valentin took the fixed wing decrement for the same reason). But in the audit report, DCAA opined that the 2010 rotary bids could not be used to decrement Supreme's costs for the audit period because there was insufficient data to adjust for: 1) availability and type of aircraft; 2) inflation; and 3) other factors such as danger levels (R4, tab 102 at 41).

133. Mr. Szar, Supreme's Aviation Operations Controller, testified credibly that in the early years of the contract there were not many vendors willing to transport cargo by helicopter or airplane in Afghanistan and that Supreme was forced to hire those willing and available, even if it was under less than optimal terms (tr. 14/34-35). Mr. Szar, a former Air Force pilot who had retired after a crash in Afghanistan (tr. 14/8) testified credibly about the enormous difficulties posed by flying conditions in Afghanistan (tr. 14/14-15, 24-25).

134. CO DiMeo had the opportunity to compare Supreme's rates to those charged by other contractors before signing Modification No. P00010. While the record is clear that the parties agreed that Supreme's costs would be audited, the extent of the audit and whether it would embrace standards of cost reasonableness is a matter of dispute. In any event, to the extent it is Supreme's burden to prove that the rates were reasonable, the Board holds that it has done so. The record does not justify a decrement of 3.36% for either rotary or fixed wing aircraft lease rates.

*Aviation Fuel Costs*

135. While DCAA had questioned all of Supreme's fuel costs based on its refusal to produce its records, the contracting officer recognized that Supreme had, of course, burned fuel and sought to compensate Supreme despite its refusal. The starting point of her analysis was a conclusion in the 2011 technical report that

Supreme's claimed fixed and rotary wing fuel consumption appeared reasonable, if based on the reduced flight times calculated in the report. (R4, tab 1386 at 37, 41)

136. Seeking other sources to determine reasonable rates, her team reviewed DLA Energy contracts for fuel in the same time period, many of which happened to be with Supreme Fuels (the division from which appellant obtained its fuel). They found that DLA Energy was paying about 23% less than Supreme's proposed cost for rotary fuel and about 17% less for fixed wing. (R4, tab 1386 at 39, 42) The contracting officer applied these lower average prices to Supreme's reported 2005 – 2009 fuel usage, thus compensating it for about 80% of the claimed fuel (R4, tab 1233 at PNM at 15-16; finding 106).

137. Supreme did not present any evidence to the Board demonstrating that the amount it paid for fuel was higher than that awarded by the contracting officer. Supreme contends that, in light of its refusal to provide fuel records to DCAA, DCAA should have responded by performing an analysis of the fuel market in Afghanistan (app. br. at 49-50). The Board disagrees, because that is not what an audit is. Supreme also disagrees with the method the contracting officer used to provide partial compensation (app. br. at 53), but Supreme provides no alternative other than payment of all of the costs that it refused to prove, which is hardly a convincing position.

138. We find CO Valentin's method of compensating Supreme for its fuel costs to be reasonable under the circumstances.

*DLA's Adjustments to Supreme's Overhead Costs*

A.   *Unexamined Overhead*

139. Although DCAA examined a portion of the overhead, there was a substantial amount that it did not. DCAA did not examine and, therefore, did not question $94,570,254 in allocated overhead, $4,803,277 in central overhead, and $789,757 in parking costs, a total of $100,163,286 after a rounding correction (R4, tab 102 at 27). DCAA did not audit the allocated overheads because it would have taken months of additional work due to Supreme's failure to record individual expenses in Microsoft Dynamics. This would have forced DCAA to obtain the underlying documents from Supreme, which had difficulty locating original documents and had a history of providing incorrect or incomplete documents. DCAA concluded that because it had audited more than 85% of the proposal and questioned more than 50% of the costs audited, there would be no additional benefit to expending months of further effort. (Tr. 7/122-23; R4, tab 102 at 15, 21)

140. CO Valentin believed that if DCAA had audited the more than $100 million in costs it likely would have found significant unallowable costs based on

the audit results for the costs DCAA did examine (R4, tab 1386 at 49). She decided to decrement Supreme's costs, and considered 5%, 10%, and 15% of the $100,163,286 ultimately settling on 10% (R4, tab 1386 at 49-50, 54; tab 1233 at PNM at 15-16).

B. *Audited Overhead*

141. DCAA audited $23,385,459 in allocated overhead. Of this amount, $14,971,913 was for generator fuel and $2,979,672 was for vehicle fuel. (R4, tab 102 at 74) As described above, DCAA questioned these costs because Supreme refused to produce its cost information (finding 108). Although it is reasonable to assume that, like aviation fuel, Supreme incurred generator and vehicle fuel costs, Supreme has not produced sufficient evidence to establish those costs. The bulk of the remaining audited overhead relates to warehouses used on several contracts for which Supreme refused to produce documentation showing how it allocated costs to the SPV contract (R4, tab 102 at 74, 77-78), and legal costs, which Supreme withdrew in part and otherwise failed to show that they were allocable to the SPV contract (*id.* at 80-82).

142. In her final decision, CO Valentin concluded that it was likely that Supreme had incurred some overhead costs. She decided to pay Supreme $1,884,501 (about 8%) of the $23,385,459 in overhead costs audited by DCAA (R4, tab 1386 at 45-46; R4, tab 1233 at PNM at 15-16).

*Aviation Conclusion*

143. As a result of the various adjustments, CO Valentin concluded that Supreme had rotary wing costs of $242,652,800 and fixed wing costs of $74,933,450 (R4, tab 1233 at PNM at 15-16, 19).

*Truck Costs*

144. Compared to her adjustments to DCAA's rotary and fixed wing costs, CO Valentin made a smaller upward adjustment to Supreme's direct truck costs. Of the $77,537,970 questioned by DCAA, CO Valentin adjusted this upward by 4%, adding $3,101,519 back to Supreme's direct costs (R4, tab 1386 at 48; R4, tab 1233 at "PNM for POT – Revised Negotiation Objectives – 9 Dec 2011-200pm - .xlsx," at "Upward Adjustment" tab). The PNM and her contracting officer's final decision otherwise subtracted from Supreme's costs the two major areas of disagreement: missing truck manifests and the 20.17% decrement for lack of a price analysis, as well as some smaller items.

145. With respect to trips missing a manifest, we agree with the government that without the contractually-required signature of a DoD receiving official (findings 26-27), Supreme cannot prove that the delivery actually took place. We

acknowledge Supreme's contention that it had internal documents showing that the deliveries occurred but we agree with DCAA that internal documents created by Supreme or its subcontractor are not a sufficient substitute for the documents required by the contract (tr. 8/125-32, 173-74), in light of Supreme's fraud guilty plea (findings 203-213) and Mr. Epp's discovery of more than 1,500 truck trips in just the first year that did not occur (finding 73). We find that CO Valentin demonstrated in her analysis of aviation costs that she was open-minded about accepting alternate documentation; we find that she acted reasonably in refusing to do so when Supreme failed to produce signed acceptance documents required by the contract.

146. The 20.17% decrement for lack of a price analysis to costs that Supreme had otherwise proven is more problematic. As described above, at the time of award, the contract provided that "host nation" contractors would deliver the cargo to the FOBs. DLA almost immediately abandoned the concept, in large part because it had found the contractors to be so unreliable. (Finding 30)

147. While the parties agreed to an audit of Supreme's POT costs, as noted above, there is a dispute over whether the costs would be subject to cost-reasonableness analysis, especially when it comes to choice of subcontractors. In any event, we conclude that the trucking subcontractor choices were reasonable. First, we note that DLA would have been familiar with the truck market based on its original plan for host nation transportation, and could have awarded the work to another firm if there were acceptable contractors with lower prices. We also take into account that when the parties executed Modification Nos. P00010 and P00012, DLA declined to relax the 97% fill rate, even though the mission had grown more complex.

148. Two more facts demonstrate the reasonableness of Supreme's subcontracting decisions on trucks. First, the trucking subcontractors selected by Supreme did an exceptional job of making deliveries to remote, dangerous places. According to CO DiMeo, "[t]hey had fabulous fill rates" (tr. 1/182), and she nominated Supreme for DLA's New Contractor award and granted it a performance bonus (tr. 1/182; R4, tab 141 at 12). Second, truck delivery to the FOBs proved to be exceedingly dangerous. The trucks were involved in more than 900 security incidents, resulting in the deaths of over 300 workers and 51 hostages taken (tr. 10/94; app. supp. R4, tab 1378 at 103-07). Given all these facts, it would be fair to say that Supreme's decision to not award the trucking subcontracts to the lowest bidder was amply justified, to say the least.

149. DLA has not directed us to any provision in the contract that required Supreme to prepare a detailed analysis of its subcontractor selection. When asked about such a requirement on cross-examination, Co Valentin cited a contract provision that required Supreme to treat DLA as its "best customer" (tr. 4/19). But that clause pertains to customer service. It required Supreme to treat DLA in a manner similar to

its other major customers and to provide a dedicated customer service representative, but it did not impose any procedural requirements for evaluating subcontractor bids. (R4, tab 1 at 32)  CO Valentin also testified that Modification Nos. P00010 and P00012 required a price analysis (tr. 4/19) but there is no such requirement in these modifications.

150.  We also find that Supreme has offered plausible explanations for not selecting either of the lower bidders.  Supreme's explanation for not selecting the low bidder – that it had not performed well on other contracts (finding 113) – was consistent with DLA's reason for abandoning host nation trucking.  The record also shows that during winter, this bidder was only willing to deliver with larger trucks in the east and sometimes to the south (app. supp. R4, tab 451 ("HEB 4" tab)).  Thus, we do not consider this a valid comparison to bidders with full availability.

151.  Accordingly, the Board finds that Supreme has demonstrated that the factual basis for DLA's truck decrement is not supported by the record.

*Profit on POT Rates*

152.  As described above, Modification No. P00010 did not set a profit rate for POT deliveries (finding 63).  Using the weighted guidelines method in the Department of Defense Federal Acquisition Regulation Supplement (DFARS) 215.404-71, CO Valentin established profit rates of 6.5% for rotary and fixed wing and 6% for truck (R4, tab 1233 at PNM at 15-16; tab 1386 at 52-53).  To obtain these figures, CO Valentin first evaluated the performance risk factor in the guidelines (which considers the technical uncertainties of performance and management cost control) and assigned Supreme above normal percentages of 6% for rotary and fixed wing and 5.5% for truck (compared to the normal value of 5%) (*id.*; DFARS 215.404-71-2 (2005)).  She then added 0.5% to each for the contract type risk factor to arrive at the final percentages (R4, tab 1386 at 53).

*Final POT Rates*

153.  Based on her analysis of Supreme's costs and an appropriate profit rate, CO Valentin established the following rates to be applied retroactively and prospectively:

| | |
|---|---|
| Rotary wing | $2.91 |
| Rotary wing w/ fuel provided | $2.61 |
| Fixed wing | $0.84 |
| Truck | $0.20 |

Using these rates, CO Valentin contended that DLA had overpaid Supreme and demanded that Supreme return $567,267,940 to DLA (R4, tab 111 at 3).

154. Supreme contends that the contracting officer should have used prices paid on other contracts to establish POT rates. Because we hold below that the contracting officer acted within her discretion in relying on cost data, we have not made detailed findings concerning prices on other contracts in Afghanistan, even though there was a good deal of testimony and evidence on this topic at the hearing. Suffice to say that, after hearing several witnesses and reviewing the expert reports, the Board credits the testimony of Mr. Donald Anderson, who examined a number of other contracts in Afghanistan but found them to be too dissimilar to the SPV contract for purposes of making a valid comparison between prices on those contracts and POT rates (tr. 9/29-31, 59-63, 65-69, 99, 116, 17/16-30). Both contracting officers also examined other contracts but could not find similar contracts for purposes of comparison (tr. 1/149-51, 2/218-20, 2/235-37, 3/50-54; R4, tab 1233 at PMN at 4). The Board found the testimony of Mr. Anderson and the contracting officers to be credible.

*Distribution Fee Credit*

155. In COFD I, CO Valentin also demanded $177,383,579, or 95% of the Distribution Fees for FOB deliveries through September 2011 (R4, tab 111 at 4, tab 1233 at PNM at 27). Despite this conclusion, DLA kept paying the Distribution Fees in full until the end of the contract and, as discussed below, CO Valentin issued a subsequent final decision increasing this portion of DLA's claim to more than $500 million. Accordingly, it is important to understand exactly what the Distribution Fee was and how DLA calculated its claim.

A. *The Relationship Between Distribution and POT Fees*

156. The Distribution Fee was supposed to contain every dollar of Supreme's compensation except for some transportation costs not relevant to this dispute and the actual purchase price of the food item (finding 24). During her testimony, CO DiMeo explained the Distribution Fee (also referred to as the distribution price) as follows:

> The distribution price . . . compensated [the contractor] for all of the services they provided, estimating the quantities of food they would need to ship, purchasing the food, *transporting it in Afghanistan*, any other services as well as their profit.
>
> . . . .

> . . . So, again, if they needed a team of people to do demand planning, purchasing, handling the food within the warehouse, rotating inventory, disposing of inventory, any service that they needed to perform as well as their profit was to be addressed in that distribution fee.

(Tr. 1/19) (emphasis added)

157. During the POT negotiations, in a November 2005 email to Supreme, CO DiMeo explained her mindset with respect to adding POT fees:

> My starting assumption is that we have distr. fees already in the Supreme contract to address over road deliveries for each of these categories of items . . . . The gap lies in applying the extra cost of air or ground support to move these items on from Kabul, or any extra charge to destinations other than Kabul, Salerno, Bagram and Kandahar.

(R4, tab 486 at 3) In other words, the Distribution Fees in the contract compensated Supreme for deliveries by truck to the four listed bases. CO Valentin understood that air delivery would be more expensive and was receptive to the argument that truck delivery to some FOBs would be more expensive than the original four bases. But the parties executed Modification Nos. P00010 and P00012 without coming to an agreement on the amount of the "gap" between what Supreme was receiving in the Distribution Fees and the additional costs of delivering to FOBs.

### B. The Audits

158. In the 2008 DCAA audit report, the auditor stated that he considered the Distribution Fees to be applicable to the original four sites only and that all of the Distributions Fees paid for FOB deliveries (minus 10.7% profit) should be refunded to DLA (R4, tab 30 at 11). This auditor did not testify at the hearing and as illustrated below, the Distribution Fees in some cases were significantly higher than the POT fees. Elimination of the Distribution Fee would mean that on some deliveries Supreme would be doing more work but receive a lower payment. Because no contractor would have agreed to this, the Board has some doubt as to how well this auditor understood the contract. Nevertheless, the auditor does appear to have recognized correctly that there likely was a duplication in payment.

159. In January 2010, DLA conducted an analysis of distribution and storage fees for other prime vendors in the Middle East and concluded that Supreme should return 55.6% of the Distribution Fees (R4, tab 35 at 1-2).

33

160. In an August 31, 2010 letter to Supreme requesting a revised proposal, the contracting officer asked Supreme to break down its costs and profit for Distribution Fees for the original four sites so that DCAA could determine the amount of any cost duplication (R4, tab 48 at 5).

161. Supreme submitted the revised proposal but, in its 2011 audit report, DCAA determined that Supreme failed to submit the requested information on its Distribution Fees (R4, tab 102 at 12-13). DCAA found that, during the POT negotiation in 2005-06, "no consideration was given for the fact that certain costs," such as "warehouse space . . . personnel and associated costs like life support, equipment, and vehicles" would have been included in the Distribution Fees for the original four sites and thus paid for in those Distribution Fees (R4, tab 102 at 13). DCAA stated that because Supreme failed to identify the cost and profit contained in the original Distribution Fees "we are unable to determine the significance of duplicated costs included in the calculation of the proposed FOB rates" (*id.*).

162. As Mr. Davis explained at the hearing, the proposal Supreme submitted for the second audit was a total cost proposal that included both POT expenses and non-POT expenses (tr. 7/226). DCAA found that Supreme accumulated all costs as contract costs without segregating them between original sites and FOBs and that, with the exception of central overhead (less than one-percent of the amount claimed), Supreme did not develop final indirect expense rates for allocation of costs to its contracts, but rather recorded all costs as direct contract costs. Supreme developed a method of allocating costs between the FOBs and the original four sites based on average weights delivered, but it made no adjustment for costs recovered in the Distribution Fees. (R4, tab 102 at 13)

163. The Board also finds that Supreme did not fully cooperate in DLA's efforts to identify the extent of the overpayment. For example, in an October 14, 2011 letter to CO Valentin, Mr. Schuster contended that "[w]hile the costs audited by DCAA may include some modest costs that would have been incurred absent the contractual changes that require negotiation of POT rates, our POT proposals have never been based on our costs, so there has been no reason for us to identify the amount of that potential duplication." (App. supp. R4, tab 1299 at 3) (emphasis added)

34

## C.     *The Problem With the COFD I Methodology*

164.  The second highest Distribution Fee under the original contract for items paid on a per pound basis was $1.20 for certain kinds of meat[9] (app. supp. R4, tab 78 at 9).  Under the original contract Supreme would be paid $1.20/lb. if it delivered a truckload of meat from its Kabul warehouse to one of the four original sites.

165.  Now assume a POT truck delivery from Supreme's Kabul warehouse to a distant FOB, perhaps the FOB in Herat in western Afghanistan.  Under the Modification No. P00010 rates, Supreme would be paid a total of $1.68/lb. for this item ($1.20 plus the $0.48 POT truck fee).  COFD I effectively reduced this to $0.26.[10] In the Board's view, this is not a defensible position.  Certainly, Supreme would have been entitled to at least the original $1.20; a reduction to $0.26 effectively gives DLA a windfall.

166.  Focusing on the second highest Distribution Fee may exaggerate the unfairness of DLA's position.  However, we observe that for Distribution Fees as low as $0.25/lb. (e.g., raw ground beef), a 95% reduction in the fee, plus a $0.20 POT fee, would result in less compensation than under the original contract.

167.  CO Valentin recognized the challenge she faced in identifying the overpayment because she did not have "a thorough audit" of the Distribution Fees (R4, tab 1233 at PNM at 19).  She stated three times in the PNM that she found it "impossible" to calculate the appropriate reduction to the Distribution Fees (*id.* at 5, 19, 24).

168.  CO Valentin testified that she cushioned the blow to Supreme by including in her calculation some conservative estimates that worked in Supreme's favor (tr. 3/79-81).  In COFD I, CO Valentin calculated DLA's demand based on estimates that FOB deliveries were 25% of total deliveries and that Distribution Fees were 25% of the Unit Price (R4, tab 111 at 4).

169.  On direct examination CO Valentin asserted that FOBs had really been 35% of the total deliveries and that Distribution Fees had really been 40% of the Unit price and that by undercounting both numbers she had reduced the amount Supreme owed (tr. 3/79-80; *see* R4, tab 111 at 4).  On cross-examination, when Supreme's attorney highlighted the amount of the reductions, she changed the number of FOB deliveries again, asserting that as many as 75% of the deliveries had been to FOBs (tr. 3/221-25).  And her supervisor, Mr. Shifton, gave an even more baffling rendition

---

[9] The highest per pound Distribution Fee was $3.80 and applied to lobster, scallops and cooked seafood.

[10] ($1.20 – 95%) plus the final truck rate of $0.20.

of the analysis, contending that DLA only reduced the $1.20 Distribution Fee to $1.13 (tr. 17/142-43).

170. After hearing this testimony, the Board concludes that DLA's numbers, however well-intentioned, are just guesses. There is nothing in the record that would demonstrate whether FOB deliveries were 25%, 35%, or 75% of the total deliveries, nor is there anything that would indicate whether Distribution Fees are 25% or 40% of the Unit Price – facts that makes it much harder, if not impossible, to calculate the amount of any overpayment.

171. Supreme's internal documents provide no clear answer, but there are enough internal emails and communications with DLA to demonstrate that Supreme knew that there was an overlap. But its employees had significantly different assessments of the overlap. In documents that vary in clarity, Supreme employees floated reductions to the Distribution Fees of 5.59%, 15.6% or 19%, as well as $0.05/pound, and a flat $49 million, or $88 – 102 million (app. supp. R4, tab 63 at 3, tab 64A at 4, tab 64B, tab 1200 at 4, tab 1299 at 10; R4, tab 267).

172. On December 20, 2010, bilateral Modification No. P00092 extended the contract (including exercised options) by two years (R4, tab 22). One might think that if the contracting officer believed that the Distribution Fees were a waste of money she would have adjusted the Distribution Fees downward to eliminate any overpayment, or at least have held them steady. She did not. Instead, DLA agreed to sizable increases to the fees that, according to Supreme averaged 33% (*id.* at 10-14), an action that the Board finds inconsistent with a belief that Supreme was being overpaid.

D. *Trying to Understand DLA's Distribution Fee Claim*

173. Ultimately, the Board finds DLA's case to be rather vague on the overlap between Distribution Fees and POT. In its post-hearing brief, DLA does not focus on the easy to grasp duplication in transportation costs first raised by CO DiMeo. Rather, it directs our attention to Supreme's inclusion of costs for the original four sites in its POT submission. But it does not identify the nature of the duplication or quantify it (DLA br. at PFF 224-227 and pp. 183-87). It alludes in a footnote to the inclusion of some flights to one of the original four sites in Supreme's POT proposal (*id.* at p. 70, n.40). But under the original contract, Supreme was entitled to payment if it made deliveries by air (finding 29).

174. The expenses included in Supreme's $702 million proposal consist mostly of aviation lease and fuel costs, and trucking costs that total $576 million. The Board believes that by any objective measurement DCAA reviewed them thoroughly, questioning improper costs (R4, tab 102 at 23). Almost all of the remaining costs were in overhead. In its 2011 report, DCAA expressed concern over "warehouse space . . .

personnel and associated costs like life support, equipment, and vehicles," that may have been included in the original distribution fees (R4, tab 102 at 13). DCAA addressed this at least in part by questioning all of the costs for warehouse space and vehicle and generator fuel (R4, tab 102 at 74). The contracting officer restored only eight percent of these costs in COFD I (finding 142).

175. To be sure, DCAA did not audit about $100 million in overhead and parking fees and there could be duplicate costs lurking in that amount. But the contracting officer had the opportunity to assess these costs in COFD I and determined that a 10% decrement was in order (finding 140). While DLA requests in its post-hearing briefs that the Board issue a decision more favorable to DLA than COFD I, it has not contended that the 10% overhead decrement should be increased.

176. Moreover, we observe that the unaudited $100 million in overhead and parking fees is far less than the $177 million Distribution Fee credit claimed in COFD I. While this may be partly due to the additional period of time covered by COFD I, it leaves the Board perplexed as to where DLA believes a $177 million duplication in payment could have occurred. It convinces the Board that while there is a germ of truth to DLA's assertions, its claim is massively overstated.

177. The Board's conclusion is that on this record we cannot identify the overlap between POT and Distribution Fees, nor can we approximate it.

*Helmand Regional Distribution Center (HRDC)*

178. In COFD I, CO Valentin also demanded a refund of $12,257,068 in POT fees paid for deliveries within one day's drive of the HRDC, a regional distribution center constructed by Supreme in Helmand Province (R4, tab 111 at 5). Supreme began making deliveries from the HRDC in December 2009 (R4, tab 111 at 4). The government, through United States Transportation Command carriers, delivered cargo to this new warehouse and from there Supreme delivered it to the FOBs. While these carriers were already delivering to Supreme in Kabul, CO Valentin testified that they received a premium to deliver to the HRDC. CO Valentin became concerned that DLA was "potentially double-paying" if it paid both this premium and a POT fee to Supreme. She concluded that, because some of the added FOBs were close to the HRDC and a similar threat level to the original four locations, Supreme should not be paid POT fees for these sites. (Tr. 2/215-18; R4, tab 111 at 4-5)

179. During the POT negotiations, CO DiMeo had prioritized simplicity to the point of initially requesting a single rate that applied to all three modes of transport (tr. 1/103) before acceding to a single rate for each mode. While Modification No. P00010 stated that the number of FOB sites was subject to change (R4, tab 7 at 2), it contained no provision adjusting rates up or down based on distance or degree of

difficulty. Evidence produced by Supreme at the hearing demonstrated that a number of the FOBs added in the first years of performance were in the Kabul area (app. ex. A-1), relatively close to Supreme's Kabul warehouse, but DLA never contended that these sites were ineligible for POT fees.

180. According to Mr. Orenstein, Supreme spent about $55 million constructing the portion of the facility that serviced the SPV contract (tr. 10/228-29). He testified that DLA saved money on the deliveries from the HRDC because previously it had been paying Supreme aviation POT rates to transport the cargo to the area (tr. 10/240-41).

181. Mr. Orenstein also testified that, in relation to Camp Leatherneck, the HRDC was "very close in terms of miles and very far away in terms of delivery" (tr. 10/236). The security situation was such that a convoy with armed security would leave the HRDC, travel 1,000 to 3,000 feet and enter a "soak yard" for 24 hours until any improvised explosive device detonated. Combined with security procedures at the gate, the actual delivery, and the return to the HRDC in another security convoy, a delivery one mile away required two days of effort. (Tr. 10/235-37) DLA did not attempt to controvert this testimony.

*Minimum Weights*

182. As described above, although Modification No. P00010 was silent on this issue, DLA paid Supreme minimum weights until CO Valentin ended the practice in 2008 (finding 81). In COFD I, CO Valentin confirmed her decision not to pay minimum weights (R4, tab 111 at 3).

183. Supreme timely appealed the contracting officer's decision (COFD I) on December 14, 2011; the Board docketed it as ASBCA No. 57884.

184. The parties agree that DLA thereafter began withholding money from Supreme's monthly payments. While they disagree on the precise amount withheld, it is between $540.4 and $540.8 million (*compare* DLA br. at PFF 470, Supreme br. at PFF 233).

*Supreme's Claims (ASBCA Nos. 58666 and 59636)*

185. On February 25, 2013, Supreme submitted a certified claim to the contracting officer that was, as Supreme described it, the "reverse image" of the government's December 9, 2011 claim (R4, tabs 113, 115). While Supreme made a variety of factual and legal contentions in the claim, the crux of it was that it was entitled to the Modification No. P00010 rates (and the Modification No. P00043 rate for rotary wing with fuel provided by the government) (R4, tab 113 at 46). Supreme

contended that from the start of performance through December 12, 2012, it was due an additional $1,802,335,141.38 (*id.*).

186. On April 25, 2012, DLA wrote to Supreme, proposing an audit for the period from August 2010 to December 2012 – the period after the most recent audit (R4, tab 114 at 1). Supreme declined, citing the pending ASBCA appeal (R4, tab 115 at 1).

187. CO Valentin denied the claim in a May 10, 2013 final decision based on her inability to review the claim without an audit (R4, tab 116). On May 15, 2013, Supreme filed a timely appeal that the Board docketed as ASBCA No. 58666.

188. On May 28, 2014, Supreme submitted a second claim seeking $598,769,101 based on compensation at the Modification Nos. P00010 and P00043 rates from December 13, 2012 to the conclusion of contract performance on December 12, 2013 (R4, tab 375 at 1).

189. The contracting officer did not issue a final decision and Supreme filed an appeal based on a deemed denial on October 20, 2014, that the Board docketed as ASBCA No. 59636.

190. At the hearing, Supreme did not submit any evidence to support its costs other than what it presented to DCAA in 2010. Among other things, this means that it has not presented any evidence to either DLA or the Board of its costs for the period from September 2010 to December 2013, nor any evidence of its fuel costs for the entire contract. (*Compare*, gov't br. at 176-77 with Supreme reply at 23)

*The Second DLA Claim for Overpayment (ASBCA No. 61361)*

191. On October 2, 2017, CO Valentin issued a second decision for the time period October 1, 2011 to December 10, 2013 (R4, tab 650). In this decision, she demanded that Supreme repay DLA an additional $358,120,738. This amount mostly consisted of a demand for refund of Distribution Fees (based on the same rationale and formula as her previous final decision) for the period from October 1, 2011, to December 10, 2013, in the amount of $345,941,775.33 (*id.* at 2). The decision also demanded $12,178,962.41 for overpayment of POT rates in October 2011, which was the last month before DLA began paying the rates in COFD I (*id.* at 1-2).

192. Supreme timely appealed that decision to the Board on October 3, 2017.

*Criminal and False Claims Act Litigation*

  A.     *JAFCO Guilty Plea*

193.  Supreme represented in its proposal that its primary supplier for local market ready items (fruits, vegetables, dairy, and bakery items) would be Barrakat Vegetables & Fruits Co.  Supreme stated that, to the extent purchased elsewhere, all local market ready products would be consolidated at Barrakat's facility in Dubai and prepared for airlift to Afghanistan in containers or tri-walls.  (Tr. 1/40-42; R4, tab 645 at 158, 389, tab 1387 at 2)  The contract required Supreme to obtain approval of any place of performance not identified in its proposal (R4, tab 1 at 111).

194.  On September 19, 2005, after a request by Mr. Alvarez, the contracting officer issued Modification No. P00003, approving Jamal Ahli Foods Co. LLC (JAFCO) and Barakat's facility as places of performance.  The modification stated that JAFCO would be an additional place of performance for local market ready support. (R4, tab 797 at 1-2)

195.  On September 20, 2007, Michael Schuster, Supreme's Director Logistics Division, wrote to CO DiMeo.  While most of his letter concerned convoy security, on the second page he stated that Supreme had hired an auditing firm with experience in government contracts that had advised Supreme to "inform the government that a relationship exists between Supreme and U.A.E. based company Jamal Ahli Foods Co. LLC[]."  (R4, tab 558)  The JAFCO portion of the letter "didn't raise an eyebrow" with CO DiMeo who was focused on convoy security (tr. 1/175).

196.  On March 3, 2009, Paul Rigby, who described himself as a "disgruntled former [Supreme] employee," wrote to CO Valentin and other DLA officials to recount a conversation he had had with another former employee concerning JAFCO. He stated that he had been informed that Supreme was the owner of JAFCO with a "UAE sponsor."  He stated that JAFCO would obtain products from Barakat, consolidate it, and add 35% to the purchase price, which increased Supreme's margin to "60ish percent."  Further, he stated that JAFCO employees were instructed not to disclose any information except about hygiene and packing issues.  (R4, tab 568)

197.  During a conference call with DLA on March 10, 2009, Supreme stated that it was part owner of JAFCO (R4, tab 572).  During another teleconference the following day, Supreme stated that it owned 49% of JAFCO and that a local sponsor held 51% of the company in trust for Supreme due to UAE restrictions of foreign companies and that JAFCO was "in reality" a subsidiary of Supreme (R4, tab 573 at 2).  DLA concluded that the JAFCO markup to the Delivered Price was improper (R4, tab 573 at 1-2; tr. 6/154-57).

198. On March 13, 2009, DLA referred the matter to the Defense Criminal Investigation Service (app. supp. R4, tab 1391 at 10-11). By letter dated March 16, 2009, CO Valentin informed Supreme that it should not include a JAFCO markup in the Delivered Price (tr. 4/145; app. supp. R4, tab 1132).

199. Despite the pendency of a fraud investigation, CO Valentin signed unilateral Modification No. P00056 on June 2, 2009, exercising the final option on the contract for the period June 8, 2009 to December 12, 2010 (R4, tab 16).

200. With the contract set to expire in December 2010, the parties entered into bilateral Modification No. P00092, effective December 20, 2010, which extended the contract for an additional two years, or until December 12, 2012 (including a base and two six-month options) (R4, tab 22).

201. Modification No. P00092 contained a new premium distribution fee of $4.46 per pound for inbound airlift based on three elements that had been separate items under the contract: JAFCO, triwalls, and inbound air (R4, tab 22 at 15; tr. 4/191) (Inbound air in this sense refers to delivery by air into Afghanistan (tr. 1/212)). Supreme had proposed this price and had provided a breakdown of the costs to DLA (tr. 4/190-93; app. supp. R4, tabs 1239, 1243, 1243A, 1243C). Supreme's breakdown indicated that the $4.46 included $0.09 for JAFCO (app. supp. R4, tab 1243A).

202. During his testimony, Mr. Orenstein endeavored to paint JAFCO as a legitimate enterprise with a valid purpose (*see* tr. 11/37-51). Because CO Valentin agreed to pay Supreme for JAFCO costs in Modification No. P00092 more than 1.5 years after learning of Supreme's ownership, it would be reasonable to conclude that JAFCO performed at least some legitimate activities. The more relevant question is whether JAFCO was also engaged in criminal activity.

203. On September 22, 2014, Supreme agreed to plead guilty to an information filed in the District Court for the Eastern District of Pennsylvania charging it with major fraud against the United States, 18 U.S.C. § 1031, conspiracy to commit major fraud against the United States, 18 U.S.C. § 371, and wire fraud, 18 U.S.C. § 1343 (R4, tab 633). The plea agreement incorporated a statement of facts that included a section entitled "The Scheme to Defraud by Using JAFCO to Increase the Delivered Price for Local Market Ready (LMR) Items" (*id.* at 15).

204. Supreme agreed in the statement of facts that it[11] effectively owned and controlled JAFCO during contract performance and knowingly concealed it from DLA and took steps to make it appear that JAFCO was unrelated to Supreme. Supreme agreed that it used JAFCO to make profits over and above the profits made from the Distribution Fees in the Contract by fraudulently increasing the Delivered Price for LMR goods sold to the United States. (R4, tab 633 at 15)

205. Supreme agreed that it had used JAFCO to markup LMR goods it purchased, which increased the Delivered Price to DLA. Supreme agreed that it included the JAFCO markup even when JAFCO employees had not provided any services and that it did not inform DLA of the JAFCO markup and the attendant profit. Supreme agreed that it deliberately tried to prevent DLA from learning of the JAFCO markup, including by omitting the markup when Supreme believed DLA knew the true price suppliers charged. (R4, tab 633 at 15-16)

B.      Bottled Water Guilty Plea

206. In the desert environment of Afghanistan, water was a critical commodity for U.S. Forces. CO DiMeo described it as a "very emotional issue" that led U.S. Central Command to require DLA to maintain a large reserve supply. (Tr. 1/175) Both DLA and Supreme wanted to obtain water from multiple sources (tr. 1/176, 11/54-55).

207. The online catalog of Supreme products from which DoD customers ordered included bottled water (app. supp. R4, tab 938A at 10). A contractor could list only one price in the catalog (tr. 1/176), which was problematic due to Supreme's procurement from multiple suppliers. From 2005 until at least April 2007, Supreme charged DLA a Delivered Price of $6.45 per case of water. (Tr. 1/177)

208. Sometime in the summer of 2007, Mr. Alvarez "casually" mentioned to CO DiMeo that Supreme was paying its suppliers various prices for the water. Mr. Alvarez represented to her that $6.45 was the average price that Supreme paid. (Tr. 1/177-78) On August 30, 2007, the parties signed bilateral Modification No. P00022 providing that Supreme could bill DLA for water based on average prices paid by Supreme during the previous two weeks (R4, tab 557 at 1-2). Based on Mr. Alvarez's representation that $6.45 was the average price, the Board finds that this did not place DLA on notice in 2007 that Supreme had committed fraud.

---

[11] The stipulation refers to "Supreme Foodservice, AG," which was appellant's name at award. In 2009, Supreme changed "AG" to "GmbH," as reflected in bilateral Modification No. P00067 (app. supp. R4, tab 134).

209. Supreme was not paying an average of $6.45 per case of water. In fact, according to Mr. Epp, water was the single most profitable item on the contract because Supreme in some cases was paying less than $2 per case. Because Supreme was selling millions of cases, the profits were "huge." The $6.45 price included Supreme's transportation costs, which it charged DLA even when the government transported the water. (Tr. 5/200-03)

210. Mr. Epp's testimony is consistent with a section of the guilty plea agreement entitled "The Scheme to Defraud by Overcharging for Bottled Water" (R4, tab 633 at 16). The agreement states that Supreme:

> [C]onspired to, and knowingly devised and intended to devise a scheme to defraud the United States and to obtain money and property of the United States, by material and knowingly false and fraudulent pretenses, representations, and promises in connection with the SPV Contract, in violation of 18 U.S.C. §§ 371, 1031 and 1343.

(*Id.*)

211. To carry out this scheme, Supreme "used an artificially high price for the transportation of water, and used JAFCO as a middleman to fraudulently increase the Delivered Price that Supreme" charged DLA from December 2005 until April 2007. Supreme charged DLA $6.45 per case but the prices it paid its suppliers ranged from $1.64 to $5.03 per case. (R4, tab 633 at 16)

212. The final paragraph of the section on the bottled water fraud states that as a result of the "schemes described above," Supreme received profits of approximately $48 million to which it was not entitled (R4, tab 633 at 16). It is not clear if this is referring to both JAFCO and bottled water, or just the latter. DLA seems to understand it as including both, calling the $48 million figure "extremely low." DLA then implies that Supreme misled the Department of Justice and the district court as to the extent of its illegal gains. (Gov't br. at 130, n.82)

## C. Resolution of the Criminal Case

213. Michael Epp, Joseph Alvarez, and Stephen Orenstein all escaped prosecution. Supreme and a related company paid $250 million consisting of: a forfeiture of $10 million; fines totaling $192 million, and $48 million in restitution (R4, tab 248 at 3, 7, tab 633 at 2-4). In addition, Supreme agreed to pay DLA a water reconciliation or true-up of $38,362,198.71 for the period from March 2007 to December 2013 (R4, tab 633 at 4).

## D.    *The False Claims Act Case Filed By Epp*

214.  On March 16, 2010, Mr. Epp, as relator, filed a lawsuit against Supreme, JAFCO, Mr. Orenstein and others under the False Claims Act, 31 U.S.C. § 3729, et seq.[12] DLA received a copy of the complaint that same day (app. supp. R4, tab 1194).  The United States later intervened in the action to effect a settlement agreement (R4, tab 247 at 1-2).

215.  In his amended *qui tam* complaint (R4, tab 617), Mr. Epp made a variety of allegations, including:  1) that Supreme negotiated "discounts" from suppliers ranging from four to nine percent that it did not disclose to DLA and which were actually illegal kickbacks (*id.* at 10-15); 2) Supreme used JAFCO to unlawfully mark up local market ready items (*id.* at 15-25); 3) Supreme inflated bottled water prices (*id.* at 25-32); and 4) Supreme misrepresented POT and other transportation costs (*id.* at 32-49).

216.  The United States intervened with respect to the first three of these allegations but declined with respect to inflated POT costs (R4, tab 247 at 2; *United States of America ex rel. Michael Epp v. Supreme Foodservice AG, et al.*, E. D. Penn. No. 10-cv-1134, Dkt. 24).  On December 6, 2014, the parties entered into a settlement agreement in which Supreme was not required to admit liability, nor was the United States required to admit that its claims were not well founded (R4, tab 247 at 2-3).

217.  In return for dismissal of the lawsuit, Supreme agreed to pay the government $101 million and to pay Mr. Epp $300,000 and his attorney $1,150,000. The government agreed to pay Mr. Epp an additional $16,160,000.  (R4, tab 247 at 3-4)  Thus, Mr. Epp, who by his own testimony was deeply involved in a staggering fraud against the United States Treasury, was rewarded with nearly $16.5 million.

*Contract Completion*

218.  Long after DLA knew about Supreme's fraud, the parties seem to have been able to maintain a good working relationship, presumably because Supreme was effective at delivering food under challenging conditions.  On June 22, 2012, after DoD and DOJ had had more than three years to investigate the fraud allegations, DLA issued a bridge contract extending performance of the SPV contract through December 12, 2013.  Among other things, the bridge contract provided for a 4.5% increase to the COFD I POT rates.  (R4, tab 194 at 1-3)

---

[12] The False Claims Act permits private individuals to initiate lawsuits on behalf of the government.  31 U.S.C. § 3730(b).  These are known as *qui tam* suits, and the individual bringing the suit is known as the relator.

219. In 2011-2012, DLA conducted a procurement for a follow-on contract, which attracted proposals from Supreme, Anham FZCO, and four other offerors. *Supreme Foodservice GmbH v. United States*, 112 Fed. Cl. 402, 407 (Fed. Cl. 2013). DLA conducted a technical evaluation that, among other things, considered past performance. *Id.* Following a bid protest filed by Supreme at the Government Accountability Office (GAO), DLA conducted a partial reevaluation of the technical factors that it completed in December 2012. *Id.* at 408-409. After that reevaluation, DLA gave Supreme an overall technical rating of "outstanding," the highest possible rating. *Id.* at 410. However, despite Supreme's technical rating, DLA determined that Anham's proposal was a better value based on its lower price. *Id.* The Court of Federal Claims upheld DLA's award. *Id.* at 437-38.

220. It is undisputed that Supreme delivered billions of dollars of food that was consumed by American troops (*e.g.*, R4, tab 1233 at PNM at 27 (stating that DLA had paid Supreme almost $3 billion for product delivered through Sept. 30, 2011); (finding 237 (reflecting deliveries of more than three billion pounds through December 2013)).

221. On January 22, 2015, more than a year after Supreme completed performance, CO Valentin issued another final decision, asserting entitlement to all money paid to Supreme on the contract, or about $8.8 billion (R4, tab 123; DLA br. at 145, n.91). CO Valentin asserted five bases for the decision: 1) Supreme's misrepresentation of the actual costs of providing POT (*id.* at 2-4); 2) Supreme's guilty plea to major fraud (*id.* at 4-5); 3) Supreme's "systematic overcharging for POT" (*id.* at 5-6); 4) Supreme's misrepresentation of market basket prices in its proposal and then its increase of them sharply after award (*id.* at 6-7); and 5) Mr. Alvarez's participation in the contract as both an employee of DLA and then at Supreme was a conflict of interest (*id.* at 7-8).

222. Supreme filed a timely appeal of this new decision on January 30, 2015, that the Board docketed as ASBCA No. 59811.

223. CO Valentin addressed the 2015 final decision only briefly during her three days of testimony at the hearing.

*Final Weights*

224. Each party has submitted to the Board one or more spreadsheets that contains its tabulation of POT weights. With well over 100,000 total FOB deliveries (*see* findings 91 and 109), the numbers in the spreadsheets are virtually impossible for the Board to verify independently.

225.  Because the parties' actual weights[13] are fairly close (at least with respect to fixed and rotary wing), the Board requested that the parties confer and attempt to stipulate the weights based on a comparison of their numbers and the elimination of typographical errors or other problems, but the parties failed to reach agreement (DLA ltr. to Bd. dtd. January 10, 2020; Supreme ltr. to Bd. dtd. January 15, 2020).

226.  Supreme has provided its weights for the entire project in exhibit A-18. While Supreme's exhibit has the advantage of being comprehensive, it comes with the baggage of fraud convictions and our findings concerning the quality of its recordkeeping.

227.  DLA's weights are contained in exhibits G-2 and G-3.  Only G-2 was discussed by a DLA witness (tr. 3/76) or in DLA's post-hearing brief (gov't br. at 148).  This spreadsheet contains weights only from December 2005 to September 2011.  Exhibit G-3 contains weights from December 2005 to June 14, 2013.  Thus, neither DLA spreadsheet contains the weight delivered during the final six months of performance.

228.  In its January 10, 2020 letter to the Board, DLA proposes weights for the entire contract term.  It appears that in the negotiations with Supreme, DLA reviewed its records and made some corrections to exhibit G-3 and it added weights for the final six months of the contract (Supreme ltr. to Bd. dtd. January 15, 2020 at attachment pp. 20-21 of 25).  The source of the latter information is not clear.  DLA did not file its reworked G-3 with the Board, presumably because the Board closed the record at the conclusion of the hearing per its normal practice (tr. 17/187).

229.  The Board finds that neither party has provided the Board with weight evidence that is clearly correct.  While in an ordinary case this might be ruinous for the party with the burden of proof, this is not an ordinary case.  As we discuss below, the intertwined nature of the POT rate claims forces each party to act like both a plaintiff and a defendant.  Under these circumstances, a decision by the Board that the weight evidence is too imprecise for us to make findings of fact would effectively be the same thing as declaring DLA the winner because it has already recovered more than $540 million from Supreme.

230.  There are two determinations that the Board must make.  First, we must decide the weights for the period covered by the second DCAA audit.  The proven costs during this period for each mode of transportation must be divided by the pounds for that mode during this period, resulting in final rates.  Second, the weights for the

_____

[13] The parties provided the Board with both actual (or net) weights and billable weights.  The latter numbers are higher because they include minimum billable weights.  We will focus on actual weights.

entire contract must be determined so that they can be multiplied by the final rates to determine the total amounts due Supreme.

231. We start with each party's pounds for aviation deliveries during the audit period (December 2005 to August 2010).

Fixed Wing
Supreme     95,198,825 lbs.
DLA         93,692,369

Rotary Wing

Supreme     64,811,476
DLA         64,658,989

Rotary Wing – GFM

Supreme     23,937,468
DLA         24,686,986

(DLA ltr. to Bd. dtd. January 10, 2020; Supreme ltr. to Bd. dtd. January 15, 2020) As can be seen, the parties are less than one percent apart on each rotary calculation, and less than two percent on fixed wing.

232. The truck pounds for the audit period are:

Truck
Supreme     797,302,909
DLA         784,418,215

(DLA ltr. to Bd. dtd. January 10, 2020; Supreme ltr. to Bd. dtd. January 15, 2020) The gap between the parties is less than two percent. The truck difference is largely due to DLA's refusal to include truck deliveries from the HRDC in its calculation (DLA ltr. to Bd. dtd. January 10, 2020 at 4).

233. As can be seen, in three of the four categories, Supreme's pounds are slightly higher than DLA. This actually presents a disadvantage to Supreme in one respect because increasing the weight lowers the final rate.[14] A lower final rate costs Supreme some money when it is used for all pounds after the audit period. For this

---

[14] For example, if final costs were $1 million and the weight was 500,000, the final rate is $2 ($1 million ÷ 500,000). If the weight is increased to 600,000, the final rate drops to $1.67.

reason and because Supreme's pounds are within 0-2% of the DLA numbers, we believe that there are sufficient indicia of reliability for the Board to rely on Supreme's numbers, especially since we lack comprehensive records from DLA.

234.  Accordingly, the Board will use Supreme's pounds for calculating final rates in the decision below.

235.  With respect to total weights, Supreme and DLA are less than 2% apart on fixed wing deliveries and less than 1% on the rotary wing deliveries.  The Board accepts Supreme's numbers of 175,543,224 fixed wing pounds, 135,279,720 for rotary wing, and 63,974,718 for rotary wing with government-provided fuel.  (Supreme ltr. to Bd. dtd. January 15, 2020)

236.  With respect to truck deliveries, the parties are on a percentage basis much farther apart with DLA at 2,354,589,234 lbs. and Supreme at 2,772,211,907 (DLA ltr. to Bd. dtd. January 10, 2020; Supreme ltr. to Bd. dtd. January 15, 2020).  However, we believe that the difference is again largely due to DLA's refusal to include deliveries from the HRDC in its number, a decision with which we disagree (DLA ltr. to Bd. dtd. January 10, 2020 at 4).  The Board accepts Supreme's number.

237.  Because Supreme is entitled to an additional 4.5% during the final year of the contract (finding 218), we break down the weights into two periods:  1) from the start of POT in December 2005 to December 14, 2012; and 2) December 15, 2012 to December 14, 2013.  The truck pounds through December 14, 2012 are 2,392,143,150.  The truck pounds for the final year are 380,068,757.  The fixed wing pounds for the first seven years are 157,066,864 and 18,476,360 for the last year.  Rotary wing pounds for the first seven years are 127,690,988 and 7,588,732 for the final year.  The rotary wing with GFM pounds are 58,638,241 for the first seven years and 5,336,476 for rotary with GFM for the final year.  (Supreme ltr. to Bd. dtd. January 15, 2020 at 9)

## DECISION

I.    The POT Claims (ASBCA Nos. 57884, 58666, 59636, 61361)

While there are four appeals pending, two stem from COFDs in which the contracting officer demanded repayment (ASBCA Nos. 57884, 61361) and two arise from Supreme claims (ASBCA Nos. 58666, 59636).  Complicating matters somewhat, each party contends that the other is the real claimant and has the burden of proof (gov't br. at 175; app. br. at 6, 25, 63).

In the Board's view, the most significant appeal is ASBCA No. 57884 because in COFD I the contracting officer established the key issues by:  setting final POT rates and reducing the Distribution Fees for FOBs; designating certain FOBs as

ineligible for POT fees; and demanding the return of amounts already paid. Importantly, all of the evidence supporting Supreme's POT rates came from this period.

Due to the Board's *de novo* review, the Board can award more or less than the contracting officer in her final decision. *Grumman Aerospace Corp.*, ASBCA No. 48006, 06-1 BCA ¶ 33,216 at 164,622. Thus, the Board's review of the actions taken in COFD I will resolve most of the pending issues. In its brief, Supreme states that it filed ASBCA Nos. 58666 and 59636 only as a protective measure in light of the Federal Circuit's decision in *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323 (Fed. Cir. 2010) but it now contends that the Board need not address these appeals separately (app. br. at 64 n.16). We conclude that, with the exception of entitlement to CDA interest, Supreme's appeals are essentially redundant and the Board will focus on ASBCA No. 57884.

A. *The Burden of Proof*

This fact pattern does not fit neatly into the government claim "box," nor the contractor claim box. As set forth in Modification Nos. P00010, P00012, P00043, and P00076, the parties agreed on tentative rates and agreed that DLA would reimburse Supreme using lower interim rates until DCAA completed its audit. The dispute boils down to DLA's contention that the interim rates were too high and resulted in overpayment versus Supreme's contention that it has been underpaid and that the COFD I rates are too low. While both parties want to adjust the rates, they both cannot simultaneously have the initial burden of coming forward with evidence, that is, the burden of production. We look for an answer in general contract law, the congressional purpose in enacting the CDA, and the language in the SPV contract at award and in Modification Nos. P00010 and P00012 to determine which party had the burden of production in the first instance.

We start with the basic proposition that the "'party incurring the relevant costs is in the best position to adduce and establish such proof.'" *S. Nuclear Operating Co. v. United States*, 637 F.3d 1297, 1304 (Fed. Cir. 2011) (quoting 11 Arthur L. Corbin & Joseph M. Perillo, *Corbin on Contracts* § 57.10 n.15 (rev. ed. 2005)). The purpose of the CDA is to encourage resolution of disputes at the contracting officer level to save the parties the expense of litigation. *Maropakis*, 609 F.3d at 1331. A contracting officer's review is facilitated by presentation of actual cost data.

Once the contracting officer issued the verbal change order on August 26, 2005, Supreme was on notice that it needed to track its costs. As the Federal Circuit has explained, the issuance of even a change order request "should signal to the prudent contractor that it must maintain records detailing any *additional* work . . . ." *Dawco Constr., Inc. v. United States*, 930 F.2d 872, 881 (Fed. Cir. 1991), *overruled on other*

*grounds by Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995) (emphasis in original). The use of actual costs "is preferred because it . . . ensur[es] that the final amount of the equitable adjustment will be just that—equitable—and not a windfall for either the government or the contractor." *Id.* at 882.

The history of the negotiations demonstrates that Supreme understood that, in seeking POT, it was submitting an REA (findings 56, 62). The SPV contract's REA clause (findings 25; DFARS 252.243-7002), governed this process. It provided that an REA request "shall include only costs for performing the change" and not "any costs that already have been reimbursed or that have been separately claimed." FAR 252.243-7002(a). The clause required certification of the REA because it exceeded the simplified acquisition threshold, or $100,000, per FAR 2.101 (2005). DFARS 252.243-7002(b). Mr. Epp submitted multiple certifications, albeit using the more detailed CDA claim certification language (findings 55, 59).

The REA clause granted the contracting officers broad discretion to insist on seeing Supreme's actual costs. The clause required Supreme to make "full disclosure of all relevant facts . . . including actual cost data . . . ." FAR 252.243-7002(c) (emphasis added). The clause thus required Supreme to be forthcoming. By logical extension, it also prohibited Messrs. Epp and Alvarez from lying to the contracting officer, providing her misleading information, promising evidence that never appeared, or manufacturing a false crisis that jeopardized the food supply to American forces in a warzone (findings 34-61).

Even if the REA clause left any doubt as to the type of information the contracting officer could demand, such doubt is dispelled by Modification Nos. P00010 and P00012. In these modifications, the parties agreed to verification of the preliminary rates and that there would be an audit that would examine actual costs – an audit that Mr. Orenstein professed to be eager to get started (findings 60, 65, 66). Reading the REA clause in conjunction with the modifications, Supreme agreed it would make "full disclosure of all relevant facts" to DCAA and produce "actual cost data." Pursuant to Modification Nos. P00010 and P00012, DCAA would verify whether Supreme's books and records supported its representations of its costs and profit.

Supreme's contention that the audit was intended to verify its assumptions and expectations is not consistent with general contract law, the REA clause, or Modification Nos. P00010 or P00012. Supreme asks the Board to accept that there was a big misunderstanding about how its REA would be evaluated. This would require us to accept several notions that border on the absurd, including: 1) Joseph Alvarez, despite working as a DLA contracting officer for eight years, did not know what a DCAA audit is and did not bother to find out; 2) that, despite being Supreme's general manager for the SPV contract (finding 20), Mr. Alvarez failed to grasp the requirements

of the REA clause; 3) that Mr. Alvarez has no memory of key events such as his refusal to sign the REA after participating in a series of emails discussing how to inflate costs (findings 34-54); 4) that a reasonably prudent contractor performing a multi-billion dollar contract would not ascertain what it was getting into before it agreed to an audit; 5) that Supreme was surprised when DCAA verified its actual costs, even though DCAA informed Supreme it would do precisely that before Supreme signed Modification No. P00012 (finding 65); and 6) when Stephen Orenstein read the CDA claim certification, he thought Mr. Epp was certifying only the pounds delivered (finding 69). We decline Supreme's invitation to accept these notions.

B. *DLA's Use of Cost Analysis*

As we have found (finding 70), even if the government had agreed to an unusual audit where DCAA focused on Supreme's assumptions and expectations rather than its actual costs, it would not have ended well for Supreme. One can only imagine the displeasure of the auditors and contracting officer if they had read the internal Supreme documents identifying the true costs and profit margins and compared them to Supreme's representations to DLA. Whether DCAA had used traditional or non-traditional audit techniques, Supreme's representations would not have survived the light of day.

Supreme's reliance on our decisions in *United Launch Services, LLC*, ASBCA Nos. 56850, 57542, 57661, 16-1 BCA ¶ 36,483 (*ULS II*) and *United Launch Services, LLC*, ASBCA Nos. 56850, 57542, 57661, 14-1 BCA ¶ 35,511 is misplaced. While that appeal involved a commercial items contract, the opinions in those appeals do not state that the contract contained the DFARS REA clause. Nor did the parties agree to verification of the contractor's costs through an audit, which makes it very different from these appeals. The Board found that the contract did not define "equitable adjustment" and the meaning in the context of that contract was unclear. *ULS II*, 16-1 BCA at 177,765. The Board found that the appellant had proven that the parties had negotiated equitable adjustments based on market conditions and not merely costs. *Id.* The Board held that once the government made the change at issue, the commercial value of the services became a reasonable factor in determining the amount of the change. *Id.*

In these appeals, the Board does not believe that the term equitable adjustment is unclear. For the reasons stated above, the REA clause and Modification Nos. P00010 and P00012 clearly set forth what Supreme was required to show for the tentative POT rates to become final.

C. *Audit Standards*

Supreme also contends that DCAA acted improperly when it applied FAR Part 31 standards to the audit. As we have found, this is simply how DCAA conducts an audit (finding 84), something Mr. Alvarez knew or should have learned before signing Modification No. P00012.

In its briefs, Supreme tries to make the case that it has been treated badly by overzealous auditors, but that is not the reality. The Board agrees with Mr. Davis who testified that most of the areas in dispute involved sound business practices (tr. 7/111; finding 87) rather than compliance with what Supreme seems to view as obscure regulations. Supreme's problems were caused by its failures to record data in its accounting system and retain copies of basic records, including subcontracts and signed manifests, its refusal to produce fuel-related documents to DCAA, and its refusal to undergo an audit for the last three years of performance (findings 95-98, 104-07, 186). And the core problem was that many of Supreme's numbers were unverifiable because they were simply the product of Mr. Epp's fertile imagination. We reject Supreme's complaints about DCAA.

D. *Supreme has the Burden of Production*

Supreme had the burden of producing evidence of its costs to DLA and DCAA. That obligation carried through to proceedings before the Board, but Supreme did not furnish the Board with new evidence that would fill in the holes in its submission to DCAA and DLA. Rather, Supreme has attempted to minimize its criminal conduct, complained about the difficulty of maintaining records, and urged the Board to accept internal documents that purport to substantiate its costs. In essence, Supreme wants the Board to let it off the hook for failing to track its costs on a multi-billion dollar contract. That would not be consistent with the law or the contract. Nor would it be wise or just given the demonstrated fraud, the peculiar accounting practices, and the evidence of overstated flight times. We hold Supreme to its proof.

Supreme cites the Board's lengthy decision in *Kearfott Guidance & Navigation Corp.*, ASBCA No. 49271 *et al.*, 04-2 BCA ¶ 32,757, which, like the present matter, involved a government demand for repayment after DCAA issued an audit report, in support of its contention that DLA has the burden of proof. However, *Kearfott* was a more straightforward overpayment case than these appeals, which stem from Supreme's failure to prove the underlying costs in an REA, an element that does not seem to have been at issue in *Kearfott*.

We recognize that requirements imposed by the CDA, the FAR, and precedent sometimes complicate the basic plaintiff-defendant paradigm in which the plaintiff carries the burden of proof. *See Cost Issues*: *Who Has the Burden of Proof?*,

52

17 No. 10 Nash & Cibinic Rep. ¶ 54 (Oct., 2003); *Government Claim or Contractor Claim*: *Jockeying for Position*, 7 No. 4 Nash & Cibinic Rep. ¶ 19 (Apr. 1993). Thus, in some appeals the Board has recognized the government as the claimant but the contractor as the party with the burden of proof. *E.g.*, *Kellogg Brown & Root Services, Inc.*, ASBCA No. 58081, 17-1 BCA ¶ 36,595 at 178,234, 178,240. The Board views these appeals as comparable, because even though Supreme had the burden of production to support the costs in its REA, we still view the government as the primary claimant, as we discuss below.

### E.  DLA's Affirmative Defenses

The hybrid nature of these claims leads to a second problem beyond determining which party has the initial burden of production:  to what extent can DLA assert affirmative defenses to defeat Supreme's claims?

### 1.      *Which Party is the Claimant?*

In *Supreme Foodservice GmbH*, ASBCA No. 57884*, et al.*, 16-1 BCA ¶ 36,387, the Board considered Supreme's motions to dismiss or for summary judgment on DLA's affirmative defenses. The Board granted Supreme summary judgment on DLA's affirmative defense that certain conduct related to JAFCO had been released in the False Claims Act settlement, but we otherwise denied Supreme's motions on the affirmative defenses. *Id.* at 177,400. After development of a full record, we now consider an issue not addressed by the Board in that decision:  whether DLA can assert affirmative defenses when COFD I appears on its face to be a government claim?

DLA raises two broad categories of affirmative defenses:  first material breach and fraud in the inducement. The former encompasses the guilty pleas arising from the JAFCO and bottled water fraud, and what DLA describes as false POT costs and profit rates, Supreme's failure to cooperate in the DCAA audit, "systematic overcharging" on food items, failure to pass on rebates and discounts to DLA, failure to disclose violations of law, and conflict of interest violations based on Mr. Alvarez's prior work at DLA (DLA answer to third amended compl. at pp. 71-85). DLA's fraud in the inducement theory includes JAFCO and false POT rates, as well as false market basket pricing (*id.* at pp. 85-88). DLA also pled assumption of risk and failure to mitigate as affirmative defenses (*id.* at pp. 88-89) but it appears to have abandoned them.

Although not stated clearly in DLA's briefs, DLA's approach to the appeals is what could be described as "heads we win, tails you lose." It contends that it should prevail on the merits of the POT rates established by COFD I but, even if it loses, it can use its affirmative defenses to prevent Supreme from gaining an upward adjustment to the COFD I rates (gov't reply br. at 40-41). If DLA is correct, it would

appear that the contracting officer could have reduced POT rates to zero and demanded the return of the more than $1.7 billion in POT fees it paid Supreme, and Supreme would not be able to challenge it. Or, to draw the argument out further, the contracting officer could have reduced the contract price from $8.8 billion to zero and Supreme would have no legal recourse.

Although the facts and procedural posture of these appeals are unusual, in 2017 the Board issued a decision involving comparable facts. *Kellogg Brown & Root Services, Inc.*, ASBCA No. 56358, *et al.*, 17-1 BCA ¶ 36,779 (*KBR I*) (*aff'd Sec'y of Army v. Kellogg Brown & Root Services, Inc.*, 779 Fed. App'x. 716 (Fed. Cir. 2019) (*KBR II*)). In those appeals, the Army paid KBR, a food service contractor in Iraq, $44 million for private security on its truck deliveries. *KBR II*, 779 Fed. App'x. at 717-18. The Army later decided that it should not have paid and made a series of withholdings to recoup the money. *Id.* KBR responded by submitting certified claims for each of the withheld payments, which KBR appealed to the Board based on deemed denials. *Id.* Although KBR sought the payment of money, the Board held, and the Federal Circuit agreed, that the facts presented a government claim. *KBR I*, 17-1 BCA at 179,247; *KBR II*, 779 Fed. App'x. at 721. The Board further held that KBR's submission of its own claims on the same subject served to start the running of CDA interest.[15] *KBR I*, 17-1 BCA at 179,247; *KBR II*, 779 Fed. App'x. at 722.

A claimant cannot use an affirmative defense to avoid the consequences of its claim failing on the merits. *Engility, LLC*, ASBCA No. 61281, 19-1 BCA ¶ 37,430 at 181,923. In other words, an affirmative defense is just that, a defense, not an offensive weapon.

We now consider what Supreme requests that the Board do with respect to the rates. Because we have concluded that the contracting officer acted properly in establishing rates based on Supreme's costs rather than on other contracts, we focus on the rates calculated by Supreme's expert, Mr. Jeffrey DuVal, who calculated rates based on the costs Supreme submitted to DCAA. Mr. DuVal has submitted a variety of calculations, including Supreme's costs submitted to DCAA plus 16% profit and plus 35% profit (ex. A-5 at 7). As discussed below, the Board believes that

_____

[15] Further support for considering the present matter to be a government claim can be found in appeals where the government paid the contractor billing rates for indirect costs and later established final indirect rates. When the government concludes that the billing rates were too high and demands repayment, the Board has treated such demands as government claims. *Quimba Software, Inc.,* ASBCA No. 59197, 19-1 BCA ¶ 37,350; *DRS Global Enterprise Solutions, Inc.,* ASBCA No. 61368, 18-1 BCA ¶ 37,131; *Pratt & Whitney Rocketdyne, Inc.,* ASBCA No. 58307, 13 BCA ¶ 35,259.

Mr. DuVal's most realistic calculation is the 16% profit scenario. But it suffices to say for the moment that even if none of the costs submitted to DCAA were questioned and 35% profit then were added to those costs, the rates would be less than the Modification No. P00010 rates. In other words, Supreme is not seeking an upward adjustment from Modification No. P00010's "tentative agreed rates" (finding 62) based on Mr. DuVal's analysis. Moreover, based on actual costs, it lacks a non-frivolous argument that the Modification No. P00010 rates (or higher amounts) should be the final rates.

### 2. *Supreme's Interest Claim*

Because the Board agrees with many of the adjustments that the contracting officer made to Supreme's rates, our determination that the facts primarily present a DLA claim might end the need for the Board to consider DLA's affirmative defenses but for one consideration: DLA has already withheld about $540 million from Supreme to recoup the overpayments (finding 184). As detailed below, the Board makes relatively minor adjustments to the rotary and fixed wing rates, holds that Supreme is entitled to be paid POT fees for deliveries from the HRDC, and remands for an adjustment of the truck rates. Due to the size of the DLA withholding, the Board believes that there is a significant possibility that DLA will have to return some money to Supreme. If so, Supreme will be potentially entitled to CDA interest on the amounts withheld. This interest, then, would fit into the "box" of being a contractor claim and, as such, would be subject to DLA's affirmative defenses. Because the lead appeal is now more than eight years old and there are about 40 other Supreme appeals that may be affected by this decision, we will address DLA's affirmative defenses. We start with DLA's contention that Supreme committed the first material breach due to the JAFCO and bottled water guilty pleas.

### a. *The Guilty Plea*

"Prior material breach is a federal common law defense asserted when a party breaches a contract after another party has already breached the same contract." *Laguna Construction Co., Inc. v. Carter*, 828 F.3d 1364, 1369 (Fed. Cir. 2016) (citing *Christopher Village, L.P. v. United States*, 360 F.3d 1319, 1334 (Fed. Cir. 2004)). The doctrine "can bar a contractor's breach claim against the government, even if the government's later-occurring breach happened without knowledge of the first breach." *Id.* The Federal Circuit has explained that "[a]pplication of the prior material breach rule in CDA proceedings at the Board comports with the Supreme Court's instruction that the government must be able to 'rid itself' of contracts that are 'tainted' by fraud . . . ." *Id.* at 1371 (citing *United States v. Acme Process Equip. Co.*, 385 U.S. 138, 146 (1966); *United States v. Miss. Valley Generating Co.*, 364 U.S. 520, 563 (1961)).

But what happens if, like here, the government continues with the contract for years after it has been put on notice of the breach? In some cases, the Federal Circuit has held that, when faced with a material breach, the non-breaching party has the choice to continue to perform under the contract or to cease to perform. Conduct indicating an intention to continue the contract, in effect, waives the right to assert that the breach discharged an obligation to perform. *Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1383 (Fed. Cir. 2004).

The breaching party bears the burden of proving such a waiver. *Westfed Holdings, Inc. v. United States*, 407 F.3d 1352, 1360 (Fed. Cir. 2005). A waiver may be express or implied. An "[i]mplied waiver may be inferred by conduct or actions that mislead the breaching party into reasonably believing that the rights to a claim arising from the breach were waived." *Id.* at 1360-61; *Long Island Savings Bank, FSB v. United States*, 503 F.3d 1234, 1252 (Fed. Cir. 2007).

The Board finds that by June 2010 DLA had ample evidence of Supreme's extensive fraud. The record indicates that after Mr. Rigby's revelations concerning JAFCO in March 2009, Supreme admitted that it owned JAFCO and DLA referred the matter later that month for a criminal investigation (findings 196-98). By June of 2010, Mr. Epp had filed his *qui tam* complaint, his attorney had made his treasure trove of documents available to the government, and he had sat through exhaustive interviews with the government (findings 76, 214). While DLA may not have known every detail of Supreme's conduct by June 2010, it was well-aware of major components of it.

b.      *DLA Did Not Waive Its Defense*

Despite DLA's knowledge of at least some aspects of the fraud in 2009-10, we hold that DLA did not waive its defense for three reasons. First, *Laguna* involved comparable facts in that the government in that appeal learned of a kickback scheme in January 2008 on a contract where the physical work was not done until sometime in 2010. *Laguna*, 828 F.3d at 1372. The government obtained its first guilty plea by a Laguna project manager in October 2010. *Laguna Construction Co., Inc.*, ASBCA No. 58324, 14-1 BCA ¶ 35,748 at 174,945. The parties continued with final accounting and auditing functions in the years that followed. The government did not raise its first material breach defense to Laguna's claim at the Board until after a final guilty plea by a Laguna senior executive in July 2013. *Laguna*, 828 F.3d at 1367.

The Federal Circuit held that it was reasonable for the government to wait to invoke the first material breach defense until after the senior executive's July 2013 guilty plea. The court of appeals held that the government did not have a "known right" until after this guilty plea. *Laguna*, 828 F.3d at 1372. Because the government in that appeal had some notice of criminal conduct as early as 2008 and obtained a

guilty plea in 2010, *Laguna* means that the government may wait until the criminal process has concluded before asserting its first material breach defense.

In these appeals, more than five years passed between the Rigby allegations concerning JAFCO fraud in March of 2009 and the 2014 guilty plea (finding 196, 203). The Board does not find it surprising that a complicated white-collar case involving a lot of paper, hundreds of millions of dollars, and a defendant with the means to mount a vigorous defense did not conclude until after the physical work on the contract had been completed. We will discuss below the reasons DLA allowed Supreme to continue performing until December 2013, but we hold that *Laguna* supports DLA's position.

Second, we hold that DLA did not expressly waive its right to assert first material breach, nor did it impliedly waive it. Rather, the evidence shows that the government carefully worked through the allegations. As an immediate measure less than two weeks after receiving Mr. Rigby's allegations, CO Valentin directed Supreme to stop including JAFCO costs in the Delivered Price, to provide a written explanation for the "discrepancies," and to propose a remedy (finding 198; R4, tab 575). The record indicates that Supreme hired outside counsel and thereafter mounted a robust but ultimately unsuccessful campaign to convince DLA and DOJ that the JAFCO charges were appropriate (R4, tabs 577, 619; app. supp. R4, tabs 1166, 1402A). It was reasonable for DLA to take into account that Supreme sharply contested the fraud allegations before terminating the contract or taking other actions against Supreme.

A key document with respect to DLA's preservation of its rights is bilateral Modification No. P00092, signed in December 2010, which extended the contract for two years (finding 172). DLA viewed the modification as an effort "to stop the bleeding immediately" (app. supp. R4, tab 1533) and it contained several provisions that served to protect the government's interests:

- Supreme agreed to disclose the price Supreme or its affiliates including JAFCO paid for the delivery of products;

- Supreme agreed to accept service of process for civil and/or criminal actions initiated by the government and agreed to provide a registered/authorized agent to accept service;

- Supreme agreed to waive defenses based on personal jurisdiction;

- Supreme agreed to cooperate in any investigation relating to the contract, with cooperation defined as making officials available for interviews, production of records, "and other assistance requested by the Government";

57

- Supreme agreed to submit its monthly reports with a statement signed by a senior official stating that all information in the report was true and accurate; and

- When submitting catalog price changes, Supreme agreed to submit a statement from a senior official stating that to the best of the official's knowledge and belief all pricing information in the change was true and accurate.

(Finding 172; R4, tab 22 at 3-4)  The Board does not see anything in Modification No. P00092 that impliedly waived DLA's rights.  Rather, the Board concludes that a reasonable contractor would have known that the government was preserving its rights.

Third, in *Northern Helex Co. v. United States*, 455 F.2d 546 (Ct. Cl. 1972) the Court of Claims discussed another exception to the waiver rule: where it is commercially reasonable to continue to perform.  The Court held that the non-breaching contractor did not waive its right to claim breach where continued performance was the only practicable choice based on the unique characteristics of its business. *Id.* at 553-54.

The Board concludes that continuing with Supreme was DLA's only practicable choice.  As we have found, in 2010, the contracting officer concluded that there was no other contractor at that time prepared to replace Supreme (finding 127).  When evidence of Supreme's fraud accumulated in 2009-2010, DLA had to weigh it against the fact that it would take months to get a replacement contractor and that contractor might be less effective than Supreme.  If DLA had terminated Supreme, in the months that followed American troops would have gone from baked goods and fresh fruits and vegetables to operational rations.  DLA's actions were reasonable under the circumstances.

While this may answer the question as to why DLA did not replace Supreme in 2009-10, one might ask why DLA did not replace Supreme until after its contract expired in December 2013.  The answer is that DLA tried but Supreme did not go away quietly.  DLA issued a solicitation for the follow-on contract in April 2011 but Supreme successfully mired DLA in bid protests at the Government Accountability Office (GAO) and the Court of Federal Claims for more than two years. *Supreme Foodservice GmbH v. United States*, 112 Fed. Cl. 402 (2013); *Supreme Foodservice GmbH v. United States*, 109 Fed. Cl. 369 (2013); *Supreme Foodservice GmbH*, B-405400.6, 2013 WL 1324949 (Comp. Gen. Mar. 27, 2013); *Supreme Foodservice GmbH*, B-405400.3, 2012 WL 5244576 (Comp. Gen. Oct. 11, 2012); *Supreme Foodservice GmbH*, B-405400.1, 2011 WL 5387717 (Comp. Gen. Oct. 31, 2011).  Without dissecting all these decisions, it is safe to say that the bid protests forced DLA

to stick with Supreme far longer than it wanted.[16]  *See*, *e.g.*, *Supreme Foodservice*, 112 Fed. Cl. at 408.  Thus, we can hardly fault DLA for continuing with Supreme from 2011-2013 when Supreme's own bid protests forced DLA to do so.

c.    *The Bridge Contract*

In one last twist, Supreme contends that the Board should treat the extensions from 2010-2012 and 2012-2013 as separate contracts to which the guilty plea affirmative defenses do not apply.  This is clearly not the case for the extension from 2010 to 2012, which the parties implemented through a bilateral modification to the existing contract, despite later references to the extension as a bridge contract (finding 218; *Supreme Foodservice GmbH*, ASBCA No. 57884 *et al.*, 16-1 BCA ¶ 36,387 at 177,378).

With respect to the final extension (finding 218), it is correct that DLA viewed it as a bridge contract.  *Supreme Foodservice*, 109 Fed. Cl. at 380.  As the name implies, bridge contracts bridge the gap between an expiring contract and a successor contract, often to maintain services because a GAO bid protest has triggered an automatic stay.  *Innovation Development Enterprises of America, Inc. v. United States*, 600 Fed. App'x 743, 744 (Fed. Cir. 2015); *SVD Stars II, LLC v. United States*, 138 Fed. Cl. 483, 486-87 (2018).

The bridge contract addressed POT rates, providing for a 4.5% increase to the COFD I rates (finding 218).  The parties agreed that the payment of the increased rates was without prejudice to ASBCA No. 57884, and both parties reserved all of their legal rights and remedies regarding POT.  (R4, tab 194 at 2-3)  The bridge contract was otherwise very similar to the SPV contract.  It had the same parties, required Supreme to continue performing the same work, used the same contract number, incorporated by reference all terms and conditions and modifications of the SPV contract, continued the same numbering sequence for modifications, and provided that unresolved claims and REAs were not affected by the bridge contract (*id.* at 2; app. supp. R4, tabs 170-92).

Supreme cites *Afghanistan Trade Transportation Co., Ltd.*, ASBCA No. 59782, 15-1 BCA ¶ 36,077, in support of its contention that DLA's affirmative defenses arising under the SPV contract do not apply to the bridge contract.  That appeal involved a blanket purchase agreement (BPA) pursuant to which the Army issued multiple orders.  *Id.* at 176,163.  The Board held that the BPA itself was not a contract but that the orders were.  *Id.* at 176,166.  Because all of the orders were essentially

---

[16] Indeed, the fact that these bid protests lasted for so long and could not be dismissed out of hand illustrates the challenges that DLA would have faced had it attempted to terminate the contract for breach prior to the guilty pleas.

standalone contracts, the Board held that affirmative defenses relating to fraud on contracts entered into in 2008 did not affect contracts entered into in 2009. *Id.*

*Afghanistan Trade* does not govern the facts here. The relationship of the individual task orders in that appeal does not speak to these facts. The SPV and bridge contracts were inextricably intertwined for POT purposes and the parties have treated them as such. In theory, it might be possible to treat the bridge contract as a separate contract, but that is not what Supreme has done, except in its efforts to avoid the government's defenses. To put a finer point on it, if the bridge contract were treated as a separate contract, Supreme would need to prove its costs during that contractual period, but it has not done so. It would not be consistent (or fair) to allow Supreme to treat the contracts as separate for purposes of defeating DLA's affirmative defenses but one and the same for purposes of proving its costs.

### d.    *Material Breach Conclusion*

The Board holds that Supreme committed the first material breach and has lost its right to CDA interest.

### F.    *POT Profit Rates*

Supreme contends that the rates established by the contracting officer are too low. It requests, in decreasing order of preference, that the Board establish the following rates as final: 1) the Modification No. P00010 rates (app. br. at 68); 2) rates based upon an analysis of other government contracts by its expert, Jimmy Jackson (*id.* at 73); and 3) rates based on the costs Supreme submitted to DLA, "plus a fair and reasonable profit" (*id.* at 83) as calculated by its expert, Mr. Jeffrey Duval (ex. A-5).

Modification No. P00010 failed to specify a profit rate (finding 63). The modification is not ambiguous; it simply failed to address a rather important issue. We look to the Restatement for a tool to remedy the omission and then assess the parties' proposed methodologies.

RESTATEMENT (SECOND) OF CONTRACTS § 204, Supplying an Omitted Essential Term (1981), provides:

> When the parties to a bargain sufficiently defined to be a
> contract have not agreed with respect to a term which is
> essential to a determination of their rights and duties, a
> term which is reasonable in the circumstances is supplied
> by the court.

Restatement § 204 cmt. b, *How omission occurs*, identifies a number of reasons why parties to a contract may fail to agree on an essential term, including one that accurately describes the situation here: "because discussion of it might be unpleasant or might produce delay or impasse." Modification No P00010 fixed the immediate problem of getting Supreme paid for the work it had been doing for more than seven months, relieving the "enormous pressure" on Michael Epp and CO DiMeo, but at the expense of not ironing out important details (findings 54, 61, 63).

Restatement § 204 cmt. d, *Supplying a term*, provides that in some cases the tribunal may engage in a "literal or purposive reading of the contract" to determine what the parties would have agreed to if the issue had been brought to their attention. However, where, like in these appeals, the parties were aware of the issue but simply failed to agree, the Restatement provides that the tribunal "should supply a term which comports with community standards of fairness and policy . . . ."

The Board does not believe that Supreme's first choice, the Modification No. P00010 rates, are in line with any community standard of fairness and public policy given the false statements that Supreme made to DLA in the negotiations and the gross disparity between those rates and Supreme's costs. Supreme's second choice, that the Board apply the rates calculated by Mr. Jackson in his report using a price analysis, in some respects is worse because he calculates a fixed wing rate of $3.26 per pound, which is even higher than Modification No. P00010 and would give Supreme a profit rate of nearly 150%, even if none of the costs questioned by DCAA were removed (app. br. at 73-82 (citing ex. A-6 at ¶¶ 139, 143, 148-50); finding 116).

Because we have held that the contracting officer acted within her discretion in basing the rates on Supreme's costs, Supreme's third method, which is cost based, is better than its first two. Based on Mr. DuVal's report, Supreme first requests its costs submitted to DCAA plus "at least 35% profit to fairly compensate Supreme for the increased operational and economic risk it took on in performing the POT mission . . . ." Second, Supreme requests a rate of 16%, which it views as "the floor." (App. br. at 87)

As described above, the contracting officer applied the DFARS weighted guidelines to establish profit rates of 6.5% for rotary and fixed wing and 6% for truck (finding 152). The Board has long recognized the use of weighted guidelines as an appropriate method of arriving at a reasonable profit to which a contractor is entitled. *Doyle Constr. Co.*, ASBCA No. 44883, 94-2 BCA ¶ 26,832 at 133,463 (citing *Norair Engineering Corp.*, ASBCA No. 10856, 67-2 BCA ¶ 6,619). Accordingly, the weighted guidelines approach used by the contracting officer is firmly established in the law, and, based on its consideration of the factors described below, is consistent with community standards of fairness and policy.

Of Supreme's proposed rates, only the 16% profit rate is based on the weighted guidelines or remotely within the realm of what the Board would consider as reasonable given all of the circumstances. Among other things, 35% would be three to four times the profit rates Supreme represented to CO DiMeo during the negotiations (finding 58) and more than double the maximum rate the contracting officer could award using the weighted guidelines. Supreme could have informed DLA during the negotiations that it had to make a 35% profit if it was to perform POT, but given CO DiMeo's resistance to profit rates in the low double digits, we are confident that Supreme would never have been given the POT work if it insisted on 35%.

We will compare how Mr. Duval and the contracting officer reached their profit figures, along with the "normal" percentages listed in the guidelines, to determine why they reached such different conclusions. DFARS 215.404-71-1 to 215.404-71-5 (2005); ex. A-5 at 76.

| FACTOR | NORMAL % | COFD I % | DuVAL % |
|---|---|---|---|
| Performance Risk | 5 | 6 (aviation) 5.5 (truck) | 7 |
| Contract Type Risk | Various | 0.5 | 6 |
| Facilities Capital Employed | N/A | 0 | 0 |
| Cost Efficiency | None | 0 | 3 |
| **TOTAL** | | **6.5** (aviation) **6** (truck) | **16** |

As can be seen, the differences starting with the highest are: contract type risk; cost efficiency; and performance risk.

Contract type risk: DFARS 215.404-71-3, Contract Type Risk and Working Capital Adjustment, contains a list of profit ranges for various types of contracts. DFARS 215.404-71-3(c). Mr. DuVal used "firm-fixed-price, no financing" which has a normal value of 5% and a designated range of 4-6%. Mr. DuVal correctly observes that DFARS 215.404-71-3(d) provides for evaluation of criteria such as length of contract, adequacy of cost data for projections, and economic environment. Mr. DuVal states in a footnote to his report with minimal elaboration that his evaluation of these factors led him to assign the maximum 6% value (ex. A-5 at 76).

The Board concludes that another provision in the regulation is of paramount importance here. In the evaluation criteria paragraph, the regulation provides:

Mandatory. The contracting officer shall assess the extent to which costs have been incurred prior to the definitization of the contract action . . . . When costs have

been incurred prior to definitization, generally regard the contract type risk to be in the low end of the designated range. **If a substantial portion of the costs have been incurred prior to definitization, the contracting officer may assign a value as low as zero percent, regardless of contract type.**

DFARS 215.404-71-3(d)(2) (emphasis added)

DLA paid Supreme a total of $1,767,473,638 in POT fees (app. PFF at ¶ 127; gov't br. at 221). CO Valentin crafted COFD I based on the period from the beginning of POT in late 2005 through September 30, 2011, during which DLA paid Supreme $1,383,807,545 in POT fees (finding 118). Thus, at the time of definitization, Supreme had received 78.3% of its total payment for POT costs. By any measurement, this would mean that "a substantial portion of the costs [were] incurred prior to definitization . . ." allowing her to assign a contract type risk value as low as zero percent. In selecting 0.5%, CO Valentin complied with the regulation and acted within her discretion. By contrast, we see no reasoned explanation for why Mr. DuVal selected the maximum 6% for contract type risk.

Cost Efficiency: Mr. DuVal credits Supreme with 3% of the maximum 4% increase in profit allowed under DFARS 215.414-71-5, Cost Efficiency Factor. Mr. DuVal does not explain his analysis in depth, but in a footnote to an exhibit to his second report, he cites Supreme's construction of the HRDC as a cost saving for DLA. (Ex. A-5 at 76 n.6)

This "factor provides an incentive for contractors to reduce costs." DFARS 215.414-71-5(a). If the contractor demonstrates "cost reduction efforts that benefit the pending contract," the contracting officer may increase profit by up to 4 percent. *Id.*

The Board finds that, even if we accept for the sake of argument that Supreme implemented some discrete cost reductions, Supreme has not proven overall cost savings. As evidenced by the guilty pleas, Supreme massively inflated costs on this contract. The Board finds it rather brazen for a contractor which has pled guilty to defrauding the government by millions (including on POT deliveries) and which made untruthful representations to DLA about its POT costs, would contend that it is entitled to a higher profit rate because of its supposed cost efficiency.

The Board holds that Supreme has not shown that the contracting officer erred when she refused to increase Supreme's profit rate for cost efficiency.

Performance Risk: There is less distance between the parties on this factor with the contracting officer at 6% for aviation and 5.5% for trucks (finding 152), while Mr. DuVal is at 7% (the maximum for this factor absent a technology incentive not applicable here). The regulation provides for a designated range of 3% to 7% with a normal value of 5%. DFARS 215.404-71-2(c). Thus, both parties are above the normal value. The factor considers "Technical - the technical uncertainties of performance" and "Management/cost control—the degree of management effort necessary—(i) To ensure that contract requirements are met; and (ii) To reduce and control costs." DFARS 215.404-71-2(a).

The regulation requires the contracting officer to assign a weight to the technical and management/cost control sub-factors. DFARS 215.404-71-2(b). CO Valentin assigned a weight of 50% to each sub-factor, or a maximum of 3.5% each (R4, tab 1386 at 52-53), which Supreme has not challenged.

The Board does not believe that a maximum 3.5% for management/cost control is warranted because Supreme's management defrauded the government (finding 203-12). Among other things, the regulation provides that a value significantly below normal for this sub-factor may be in order if reviews by the agency "disclose unsatisfactory management and internal control systems . . . ." DFARS 215.404-71-2(e)(3)(ii)(A). We find that the criminal and False Claims Act cases disclosed unsatisfactory management and the DCAA audit and the Donald Anderson review uncovered inadequate internal controls (findings 89, 121, 203-12).

Significantly below normal for this sub-factor would mean significantly below 2.5% (one-half the normal 5% value for performance risk), which in the Board's view would mean something less than 2%. Anything below 2.5% for the management/cost control sub-factor would result in a performance risk value lower than that assigned by the contracting officer for rotary and fixed wing, and anything below 2% would have the same result for trucks, even if one assumes the maximum value of 3.5% for the technical sub-factor.

The Board holds that Supreme has not shown that the contracting officer erred when she assigned a value for the performance risk factor of 5.5% for road and 6% for rotary and fixed wing.

Overall Profit: The Board rejects Supreme's 16% and 35% profit calculations as unreasonable. By contrast, the Board holds that the contracting officer established profit rates based on a reasoned analysis that was consistent with the law and community standards of fairness and policy.

Finally, we observe that if one were looking for a middle ground between the contracting officer's final rates and Supreme's 16% profit rate, one might ask about

the last rates Supreme proposed to DLA before the parties entered Modification No. P00010, namely, 9% truck, 10% fixed wing, and 12% rotary (finding 58). The answer is that there is no evidence that either party considered these rates binding (*see*, *e.g.*, tr. 2/157, 18/160). Neither party has asked the Board to establish these rates as final, and we decline to award relief neither party has requested.

### G. Helmand Regional Distribution Center (HRDC)

As described above, the original contract required Supreme to make deliveries from its Kabul facility to four locations ranging in distance from the Marine Base in Kabul to Kandahar, about 300 miles away. DLA compensated Supreme for its transportation costs in the Distribution Fees. (Finding 24)

There are probably many ways the parties could have priced POT fees. One obvious possibility is that FOBs near Kabul would not have warranted any additional payment because there was no additional work compared to the original contract, while distant FOBs would have merited a substantial POT fee. But when CO DiMeo negotiated the fees for DLA, she wanted simplicity to such an extent that she initially demanded one fee that would apply to rotary, fixed wing, and trucks (finding 179; tr. 1/103). However, she ultimately agreed to one rate for each mode of transportation that made no distinctions based on distance or the degree of difficulty in accessing the FOBs (finding 62).

Maps of the FOB sites added during the contract indicate that in 2005-06 DLA added a number of FOBs a relatively short distance from Kabul (finding 179). DLA has never challenged the application of POT fees to these FOBs. One might ask why these FOBs merited an additional POT fee but the other side of this issue is that for the same $0.48 per pound truck fee, Supreme had to deliver throughout Afghanistan. Regardless of whether Supreme or DLA got the best of this deal, that is what they agreed to in Modification No. P00010.

COFD I clearly indicates that CO Valentin believed that paying POT fees on short truck trips was a bad deal for DLA:

> The [sites] listed below are those that are within one day of the HRDC and that have comparable distance and/or threat level as the original four destinations. <u>There is no reasonable basis for additional cost for delivery to these sites</u> beyond the Normal DF due to their proximity to the Supreme warehouse location.

(R4, tab 111 at 4; finding 178) (emphasis added) Because the exact same thing could be said for FOBs in the Kabul area, the Board believes this was a belated recognition

by DLA that Modification No. P00010 had some unpalatable aspects. But the government cannot walk away from its obligations just because it made a bad deal.[17] The Board holds that Supreme is entitled to be paid for HRDC deliveries.

Unlike the hybrid POT rate claims, the HRDC issue is a textbook government claim for which it bears the burden of proof. The Board finds that DLA failed to prove its damages. While CO Valentin testified that DLA was "potentially double-paying" for HRDC deliveries (finding 178), this bare assertion does not convince the Board that DLA double paid, any more than Mr. Orenstein's testimony that DLA actually saved money, by itself, proves that DLA saved money. Moreover, DLA's failure to address Mr. Orenstein's plausible assertion that security requirements resulted in deliveries close to the HRDC taking two days (finding 181), casts considerable doubt on the central tenet of DLA's HRDC claim.

H. *Minimum Weight*

Supreme continues to insist that it should be paid based on minimum weights (app. br. at 62; finding 78). While the original contracting officer agreed to pay Supreme for minimum weights in the interim period, the Board has not seen any evidence that DLA agreed to include such a provision in the final rates. The Board views the payment of minimum weights in the interim as a way to protect Supreme in case the preliminary rates proved to be inadequate if, for example, it had to make numerous small deliveries on helicopters. Notwithstanding this protection, one can assume that the contracting officer did not intend for Supreme to run up its costs by sending out underutilized aircraft, but that appears to be what happened (finding 80).

The Board believes that the minimum weight issue receded once CO Valentin decided to calculate POT based on Supreme's costs. The final POT rate is Supreme's costs divided by pounds. If, for example, every fixed wing delivery below 5,000 pounds were increased to 5,000 it would increase the number of pounds for which Supreme would be paid, but the final rate would be lower because Supreme's costs would be divided by a higher number. [18]

---

[17] The Board also observes that lower cost FOBs like those around Kabul or the HRDC would have lowered Supreme's average cost and therefore would have resulted in a lower truck POT rate. Thus, to the extent that there is a problem, it is at least partially self-correcting.

[18] A simple example: two 2,500 pound deliveries result in $10,000 in costs. If the contractor were paid based on actual weight it receives $2 per pound ($10,000 ÷ (2,500 + 2,500)). If it were paid using 5,000 pound minimums it would receive $1 per pound ($10,000 ÷ (5,000 + 5,000)). With either method Supreme is paid $10,000.

Accordingly, the Board concludes that minimum weights are not applicable to final POT rates calculated using actual costs.

I.      *Distribution Fee Credit*

In DLA's view, the issue with respect to the Distribution Fee Credit "is not whether Supreme owes a credit, but how much credit is due" (gov't br. at 186). DLA acknowledges that the contracting officer calculated the Distribution Fee credit "in a less than ideal manner" (*id.*), but requests that the Board employ the jury verdict method to award damages. However, it does not retreat to a more defensible number, but rather requests that the Board award the full $177,383,579 demanded in COFD I. With respect ASBCA No. 61361, in which the contracting officer demanded a further Distribution Fee reimbursement of $345,941,775.33, DLA states that it has discovered an error in its calculation and requests that the Board remand for the contracting officer to conduct a new quantum calculation (*id.* at 187, n.109).

The general rule is that the party seeking damages must prove them with "reasonable certainty." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 833 (Fed. Cir. 2010). A claimant is not required to prove damages with absolute exactness, but its number must be more than a guess. *Id.*

This rule places DLA in an awkward position. Because the most commonly litigated claims are contractor claims, government attorneys learn about reasonable certainty soon after taking the oath of office. Thus, it is bit curious to see DLA prosecuting a claim of this size when the contracting officer has stated several times that it is "impossible" to calculate damages (finding 167).

The jury verdict approach is disfavored and may only be used when more exact methods cannot be applied. *Dawco*, 930 F.2d at 880. "In order to adopt the jury verdict method, '[the Board] must first determine three things: (1) that clear proof of injury exists; (2) that there is no more reliable method for computing damages; and (3) that the evidence is sufficient for the Board to make a fair and reasonable approximation of the damages.'" *Grumman Aerospace Corp. v. Wynne*, 497 F.3d 1350, 1358 (Fed. Cir. 2007) (quoting *Dawco*, 930 F.2d at 880). The Board holds that DLA has met the first prong of the test but not the second or third.

The Board has declined to award damages due to a failure of proof even when we found it "highly likely" that the contractor incurred costs because the contractor's failure to produce evidence was not the result of a "justifiable inability" to produce such evidence but rather a lack of effort. *American Boys Construction Co.*, ASBCA No. 60515, 17-1 BCA ¶ 36,856 at 179,590. The Board explained that "[w]e simply may not award a figure based upon speculation." *Id.*

While we find it likely that there was some overlap between Distribution Fees and POT, DLA has given us very little to work with. DLA's 225-page opening brief covers many topics in almost a mind-numbing level of detail, but it devotes less than four pages of argument to Distribution Fees, a third of which cites precedent barring contractors from double charging the government, a point no one disputes. Moreover, DLA does not address the discrete issue which we are most troubled about: the original Distribution Fees must have contained the cost of transporting the cargo by truck to the original four bases, but DLA seems to have made a litigation decision not to pursue a claim for transportation costs. Any temptation we have to formulate a jury verdict based on duplicate transportation costs is alleviated by DLA's indifference to this matter.[19]

DLA largely relies on the 2008 audit, but as we have found, the conclusions of that audit with respect to Distribution Fees are, at best, dubious and DLA did not call the auditor as a witness (finding 158). That audit was overcome by the events of Supreme's 2010 proposal and the 2011 audit. The second audit was much more thorough than the first (finding 85). The Board found the auditors who testified to be credible and professional and it is therefore telling that they were unable to find any substantial duplication between Distribution Fees and POT (finding 161). If there were over $177 million in duplicate costs in Supreme's proposal, we believe these auditors would have found it. We will go so far as to say that it is simply impossible from a mathematical perspective for there to be lurking in the audited $702 million an amount anywhere near the damages sought by DLA (findings 174-77).

A final option would be for the Board to craft an award based on the low end of Supreme's internal estimates, or about 5% of the Distribution Fees to FOBs (finding 171). But that just leads us to the dead end of: 5% of what number? DLA does not know how much it paid for Distribution Fees for FOB deliveries and we cannot calculate 5% of an unknown amount (findings 169-70).

DLA's claim with respect to Distribution Fees is denied for lack of proof of damages. While DLA probably overpaid Supreme, it is not the Board's role to relieve parties of the consequences of their litigation decisions.

---

[19] The Board acknowledges DLA's contention that Supreme's failure to produce cost information to DCAA is to blame for DLA's inability to calculate the Distribution Fee credit (gov't br. at 185-87). However, DLA built much of its case on Supreme's poor recordkeeping, so it is not clear whether Supreme has this information (*see, e.g.,* findings 95, 98, 111, 121). To the extent Supreme has such documents but failed to produce them to DCAA, we do not understand why DLA did not use the discovery process to compel production. The Board also notes that DLA did not pursue alternatives such as expert testimony calculating the value of the overlap.

J.    *Final Rotary Rates*

The Board has accepted the contracting officer's adjustments to the rotary wing rates with the exception of the 3.36% decrement based on the proposals Supreme obtained in 2010 (finding 134). We revise the contracting officer's accepted costs of $242,652,800 (finding 143) by adding the $6,852,984 amount of the decrement (finding 131). This equals $249,505,784. The price per pound is calculated by dividing this number by the combined rotary wing and rotary wing GFM actual pounds (finding 231) totaling 88,748,944:

$$249,505,784 \div 88,748,944 = \$2.81136622876324$$

We add profit of 6.5% on this amount:

$$\$2.81136622876324 + 6.5\% = 2.994105033632851$$

Accordingly, we increase the COFD I rotary rate from $2.91 to $2.99. We increase the rotary wing with GFM rate from $2.61 to $2.69. Supreme is entitled to an additional 4.5% for the final year only (finding 218). For the final year it is entitled to be paid $3.12 for rotary and $2.82 for rotary with GFM.

Based on our findings with respect to final weights (findings 235-37), Supreme is entitled to the following payments for rotary wing:

Dec. 2005 to Dec. 14, 2012:     $2.99 x 127,690,988 = $381,796,054.12
Dec. 15, 2012 to Dec. 14, 2013     $3.12 x 7,588,732 =     $23,676,843.84

Gross rotary quantum is $405,472,897.96.

Supreme is entitled to the following payments for rotary wing with fuel provided as GFM:

Dec. 2005 to Dec. 14, 2012:     $2.69 x 58,638,241 = $157,736,868.29
Dec. 15, 2012 to Dec. 14, 2013     $2.82 x 5,336,476 =   $15,048,862.32

Gross rotary with GFM quantum is $172,785,730.61.

DLA paid Supreme a total of $1,767,473,638 for POT (gov't br. at 221; app. PFF ¶ 127). However, the Board is not aware of any analysis that breaks down this number into time periods and modes of transportation and we cannot determine if Supreme has been over or under paid for rotary wing. Accordingly, the Board remands to the parties for a calculation as to the net amount due a party after taking

into account DLA payments to Supreme and the subsequent DLA withholding of over $540 million from Supreme.

We now address a separate DLA request. In its post-hearing brief, DLA asks the Board to establish a rate using only the amounts not questioned by DCAA in the second audit, and that we not include the upward adjustments made by the contracting officer (gov't br. at 222-23). It is true that we review COs' decisions *de novo* and the government is not compelled to limit its arguments to the CO's. *See Wilner v. United States*, 24 F.3d 1397, 1401 (Fed. Cir. 1994). Nevertheless, we decline this request because the CO's upward adjustments in COFD I were the result of a careful process where CO Valentin and her team made a good faith effort to ascertain Supreme's actual costs (*e.g.*, findings 128-29, 135-36). DLA did not explain in its brief why all of this work should be abandoned, but it obviously leads to the question of whether the contracting officer made a mistake when she restored some of the costs questioned by DCAA. During closing argument, the Board asked DLA counsel if the contracting officer erred by giving Supreme credit for the flights DCAA had questioned, the largest change she made. Counsel answered rather succinctly: "the contracting officer was not wrong." (Tr. 18/87-88)

DLA has not made a reasoned argument as to why we should reject the contracting officer's upward adjustments. Rather, its change of heart is based on what seems to be exasperation with Supreme. With the exception of the 3.36% decrement, the Board concludes that the analysis in COFD I and the price negotiation memorandum (finding 118) is the most reasonable and most convincing analysis that has been presented with respect to rotary and fixed wing flights.

K. *Fixed Wing Rates*

The Board has accepted the contracting officer's adjustments to the fixed wing rates with the exception of the 3.36% decrement based on the proposals Supreme obtained in 2010 (finding 134). We revise the contracting officer's accepted costs of $74,933,450 (finding 143) by adding back the $1,167,205 decrement, which results in $76,100,655 during the audit period.

$76,100,655 ÷ 95,198,825 actual pounds = $0.799386494528688

$0.799386494528688 + 6.5% profit = $0.851346616673052

As a result, we increase the COFD I rate of $0.84 for fixed wing to $0.85, plus 4.5% for the final year only. For the final year Supreme is entitled to be paid $0.89.

Supreme is entitled to the following payments for fixed wing:

Dec. 2005 to Dec. 14, 2012:    $0.85 x 157,066,864 = $133,506,834.40
Dec. 15, 2012 to Dec. 14, 2013    $0.89 x 18,476,360  = $16,443,960.40

Gross fixed wing quantum is $149,950,794.80.  The Board remands to the parties for a calculation as to the net amount due a party after taking into account DLA payments to Supreme and the subsequent DLA withholding of over $540 million from Supreme.

L.    *Truck Rates*

The Board is unable to calculate a final truck rate because the contracting officer largely adopted a DCAA calculation that was a product of its EZ Quant application and which cannot be recreated by the Board.  As described above, the Board accepts the actions taken by the contracting officer and DCAA with the exception of the 20.17% decrement related to the bids Supreme obtained in 2007 (findings 146-51).  The Board remands to the parties for a recalculation consistent with this decision.

II.    *DLA's Void Ab Initio Claim (ASBCA No. 59811)*

DLA contends that the contract is void *ab initio* and seeks repayment of all $8.8 billion it paid Supreme during the SPV contract.  As a fallback, it seeks repayment of the $1.7 billion in POT fees it paid Supreme.  DLA's pursuit of this claim has been a bit uneven.  Among other things, it failed to question CO Valentin about it during a lengthy direct examination at the hearing and has failed to respond in its reply brief to important arguments made by Supreme in its opening brief.

Supreme contends that there are fatal jurisdictional problems with the government's claim.  First, DLA is effectively seeking damages based on a fraud counterclaim, but it cites no precedent in which we have awarded such damages.  DLA seems to view a declaration that the contract is void *ab initio* as a way to circumvent this jurisdictional hurdle, which leads us to Supreme's second contention.  If we were to declare the contract void *ab initio*, then, we would lose jurisdiction to consider the appeal, since there would have been no CDA contract in being (which has been the result of previous matters involving such a finding before the Board, *see ABS Development Corp.*, ASBCA No. 17-1 BCA ¶ 36,842).  In such circumstances, DLA does not explain how the Board would, nevertheless, retain jurisdiction to order Supreme to pay DLA either $8.8 or $1.7 billion.  (App. br. 106-07, 123-25)  DLA cites no precedent in which we have done so.  Moreover, DLA does not address a rather important consequence if we held the contract to be void *ab initio*: we would be unable

to address the government's contract claims. DLA failed to respond to Supreme's arguments in its reply brief.

In addition to the jurisdictional hurdles discussed above, we have other reasons to reject DLA's void *ab initio* claim. In *Kellogg Brown & Root Svs., Inc. v. United States*, 728 F. 3d 1348 (Fed. Cir. 2013) (*KBR*), the Federal Circuit rejected what was, perhaps, a more compelling case to find a contract void *ab initio*. In that case, the government had a less ambitious agenda: it sought merely to void a subcontract. Yet, it had proof that appears to be more straightforward than anything DLA has presented. Specifically, the government demonstrated that the subcontractor in that case paid bribes and kickbacks to KBR officials who worked to override the company's initial decision to award the work to a different subcontractor. The Federal Circuit nevertheless rejected the government's claim, accepting a finding by the Court of Federal Claims that KBR most likely would have awarded the subcontract without the intervention of its corrupted officials. The court of appeals held, therefore, that the government failed to prove a causal link between the illegality and the contract provision. *KBR*, 728 F.3d at 1371-72 (citing *Godley v. United States*, 5 F.3d 1473, 1476 (Fed. Cir. 1993)).[20]

DLA relies on *Godley* and a case cited in that opinion, *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520 (1961), but as the Federal Circuit explained in *Godley*, both of these cases involved agency officials involved in the award who had been bribed or had a conflict of interest. *Godley*, 5 F.3d at 1475-76. No such facts are present in this appeal.[21]

DLA contends that if CO DiMeo had known that Supreme was inflating prices in the Modification No. P00010 negotiations, she would not have signed the modification. This is a fair point: CO DeMeo would not likely have signed the modification as written had she known it was inflated. But, by the same token, if the

---

[20] DLA contends that the Federal Circuit erred in *KBR* (*see* gov't br. at 190, n.110). Needless to say, we will follow our reviewing court's decisions.

[21] In its brief, DLA makes three void *ab initio* arguments: 1) Supreme fraudulently induced Modification No. P00010 by making false statements about costs; 2) it fraudulently induced this modification by concealing JAFCO; and 3) it fraudulently induced DLA to enter the contract by manipulating market basket prices (gov. br. at 188-99). DLA also contended that Supreme committed the first material breach due to Mr. Alvarez's conflict of interest (an issue we did not reach above because we agreed with DLA that Supreme committed the first material breach due to the criminal convictions) (gov. br. at 215-21). But in the section of its brief where it lays out its void *ab initio* arguments (gov. br. at 188-99) DLA does not mention Mr. Alvarez or contend that his conflict of interest made the contract void *ab initio*.

contracting officer in *KBR* had known about the bribes and kickbacks, surely he would have taken action. The lesson of *KBR* is that not every fraudulent or corrupt action gives rise to a void contract, even when there is bribery.

DLA has used a lot of time in these appeals contending that it should not be held to have waived its right to claim first material breach because Supreme was the only option for POT delivery (e.g., gov. reply at 46 ("Supreme's brief is mistaken that 'numerous viable alternatives existed.' App. Br., at 101. There were none. In fact, Supreme even agreed and signed Modification 92 that explicitly stated that Supreme is the 'only' source available that 'will satisfy agency requirements.'")) At the time of Modification No. P00010 execution in 2006, after DLA's abandonment of host nation trucking, there is little reason for us to believe that DLA had a good alternative to Supreme. CO DiMeo was clearly not satisfied with the cost information Supreme provided during the negotiations and Supreme's failure to provide the information delayed execution of the modification. In other words, Supreme obtained POT in spite of its deception, not because of it, a situation roughly analogous to *KBR*, where the Court of Federal Claims found that KBR would have made the subcontract award without the bribery. *KBR*, 728 F.3d at 1371-72. The absence of a corrupt action that caused CO DiMeo to sign Modification No. P00010 (or the original contract) clearly distinguishes these facts from cases where the contract award was tainted by bribery.[22]

The inescapable conclusion from *KBR* and *Godley* is that DLA is attempting to shoehorn this case into a very narrow rule. This does not let Supreme off the hook and the government's use of other fraud statutes resulted in about $390 million in fines, forfeitures, restitution, attorney fees, and a False Claims Act settlement. The government's exhaustion of its traditional remedies and DLA's desire to have a third bite at the apple have led it to rely on cases that are inapposite.

Finally, we conclude by stating that DLA's request for an additional $8.8 or $1.7 billion does not square with any traditional measure of damages. While it is undisputed that Supreme committed fraud, it is also undisputed that Supreme delivered more than three billion pounds of quality food that has been consumed by U.S. forces. Supreme successfully delivered that food in some of the most dangerous places on earth. We see no basis for awarding DLA any relief beyond that which we have awarded in this opinion or that which it obtained in the district court.

---

[22] Another distinguishing fact is that Modification No. P00010 left its prices contingent upon verification, which certainly diminishes (though not entirely) the effects of the misrepresentation.

<u>CONCLUSION</u>

The Board sustains ASBCA Nos. 57884 and 61361 in part and denies them in part. The Board denies ASBCA Nos. 58666 and 59636 with respect to Supreme's claim for interest, otherwise they are moot. The Board denies ASBCA No. 59811.

Dated: May 27, 2020

MICHAEL N. O'CONNELL
Administrative Judge
Armed Services Board
of Contract Appeals

I <u>concur</u>

I <u>concur</u>

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 57884, 61361, 58666, 59636 and 59811, Appeals of Supreme Foodservice GmbH, rendered in conformance with the Board's Charter.

Dated: May 28, 2020

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals